# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **BANK OF AMERICA, N.A.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:23-CV-826** |
| | § | |
| **ZTAR MOBILE, INC. AND** | § | |
| **KEVIN T. HADDAD,** | § | |
| | § | |
| *Defendants.* | § | |

---

**AMENDED APPENDIX TO DEFENDANTS' RESPONSE AND BRIEF IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to the Court's Supplemental Scheduling Order issued on April 26, 2024, Defendants Ztar Mobile, Inc. and Kevin T. Haddad file this Amended[1] Appendix containing the exhibits referenced in their Response and Brief in Opposition to Plaintiff Bank of America, N.A.'s Motion for Summary Judgment.

---

[1] As explained in the parties' Joint Motion to Seal and Substitute Redacted Document, Defendants are filing this Amended Appendix to include certain redactions.

## <u>INDEX OF AMENDED APPENDIX</u>

| Exhibit | Description |
|---------|-------------|
| – 1 – | Declaration of Kevin Haddad |
| – 2 – | Loan Agreement dated March 29, 2019, between Plaintiff and Ztar and other loan-related amendments/agreements |
| – 3 – | Email dated August 14, 2018, between Plaintiff's Vice President and Relationship Manager, Andrew Walker ("Walker") and Haddad |
| – 4 – | February 3, 2022, email from Michael Mayo to Jacki Castillo and Andrew Walker |
| – 5 – | May 12, 2022, email from Lisa Barksdale to Jackie Castillo |
| – 6 – | February 7, 2022, from Jackie Castillo to Brent Shields |
| – 7 – | March 8, 2022, email from Kevin Haddad to Andrew Walker |
| – 8 – | September 13, 2018, client prospectus |
| – 9 – | March 28, 2019, email from Andrew Walker to Kevin Haddad |
| – 10 – | May 12, 2022, email from Jackie Castillo to Lisa Barksdale |
| – 11 – | March 8, 2022, email from John Clarke to Kevin Haddad |
| – 12 – | October 20, 2021, email from Andrew Walker to Kevin Haddad |
| – 13 – | January 19, 2022, email from Andrew Walker to "dedicatedcanada" |
| – 14 – | December 16, 2021, email from Michael Mayo to Nikki Reeves |
| – 15 – | Emails regarding potential merchant services agreement |

# Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **BANK OF AMERICA, N.A.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:23-CV-826** |
| | § | |
| **ZTAR MOBILE, INC. AND** | § | |
| **KEVIN T. HADDAD,** | § | |
| | § | |
| *Defendants.* | § | |

## DECLARATION OF KEVIN HADDAD

Pursuant to 28 U.S.C. § 1746, I, Kevin Haddad, declare as follows:

1.      My name is Kevin Haddad. I am over 21 years of age and of sound mind. I have never been convicted of a felony or a crime involving moral turpitude. I am capable of making this Declaration and personally acquainted with the facts herein stated and have reviewed the allegations made in this lawsuit by Bank of America, N.A. ("Plaintiff").

2.      I am authorized to make this Declaration on behalf of Ztar Mobile, Inc. ("Ztar") as its President and Chief Executive Officer. I make this Declaration also on behalf of myself as an individual. I am custodian of records and an employee of Ztar and am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities. The documents filed with Ztar's Response and Brief in Opposition to Plaintiff's Motion for Summary Judgment (collectively, "Exhibits") (1) were made at or near the time by — or from information transmitted by — someone with knowledge; (2) were kept in the course of a Ztar's regularly conducted business activity; and (3) were made as part of a regular practice of Ztar's business

activity. I certify the Exhibits are true and correct and are exact duplicates of the original documents maintained by Ztar.

3.    I am an entrepreneur who, since 2004, has operated Ztar, a company that resells cellular prepaid SIM cards. While Plaintiff is a mega-institution and one of the world's largest banks, Ztar is a small business with just 15 employees. Those employees and I do not have the most sophisticated or extensive educational backgrounds, but we work hard and, through that hard work, grew Ztar to become the relatively successful enterprise it is today. Ztar does have in-house counsel, but its attorney did not review any of Plaintiff's final credit documents prior to their execution.

4.    In the years leading up to 2019, I (on Ztar's behalf) developed a reliable and uncontentious banking relationship with Plaintiff. In Ztar's dealings with Plaintiff during the decade leading up to 2019, Ztar had been in one form of loan agreement or another with Plaintiff and had never defaulted on any note, fallen materially behind on payments, or otherwise breached any of Plaintiff's loan agreements. In other words, I always considered Ztar to be a model borrower and favored small-business client of Plaintiff. By the end of 2018, Ztar had revolving lines of credit with Plaintiff totaling roughly $2 million.

5.    Since as far back as 2017, my (and Ztar's) primary contact at Plaintiff was Andrew Walker ("Walker"), Plaintiff's Vice President and Relationship Manager. Walker and I communicated frequently. Sometimes we even met socially.

---

**DECLARATION OF KEVIN HADDAD**                                                  **Page 2**

6.      Sometime in or around late-summer 2018, Walker proposed a deal whereby the bank would extend a new, $6-million revolving line of credit (though only $5.4 million would be available) that would replace and wipe out the previous credit line. Although I personally guaranteed the previous line of credit (which was not otherwise secured by a deposit account), Walker repeatedly told me the new loan would not need a personal guaranty. According to Walker at the time, the new revolving line of credit would be primarily secured by a time-deposit bank account at one of Plaintiff's Canadian institutions with a $6 million (in Canadian dollars) balance.

7.      While Walker and I negotiated the terms of the new credit deal and circulated the documents memorializing it, I noticed that the documents referenced that I would personally guarantee the debt ("Guaranty"). I objected to that and reminded Walker that was not supposed to be a part of the deal. In response, on August 14, 2018, Walker sent me an email in which he agreed and stated that Plaintiff would not require my personal guaranty under the new loan. Frankly, I trusted Walker and took this statement as the truth. After all, I thought that, from the bank's perspective, the Canadian time-deposit account should be sufficient security. I moved forward with the deal assuming the new line of credit would not entail a personal guaranty.

8.      Ztar and Plaintiff ultimately executed the new loan agreement ("Loan Agreement") in late-March 2019. On March 28, 2019, Walker showed up at Ztar's offices unannounced and, via email, told me that he was standing in the company's conference room. When I walked into the conference room, I saw Walker standing there with a stack of documents ready for my signature. I was in a rush and, assuming I could trust Walker, signed the documents without reading them.

---

**DECLARATION OF KEVIN HADDAD**                                              **Page 3**

9.     Although the Loan Agreement and other documents I signed reference my personal guaranty, I was not aware of the Guaranty's inclusion or that Plaintiff ever intended to enforce it. I instead relied on Walker's email and other assurances to me. Had I known the Loan Agreement came with the Guaranty, Ztar would not have agreed to enter into the new line of credit with Plaintiff (because, among other reasons, that would make it more difficult for Ztar to find additional lending requiring my personal guaranty).

10.     Ztar utilized the line of credit for several years, and I always made sure Ztar remained in compliance with the Loan Agreement and no debt became past-due. I always took pride in Ztar being an ideal borrower.

11.     Every year or so, as the Loan Agreement's expiration date approached, Plaintiff and Ztar would execute amendments extending the term of the line of credit. This became routine. Altogether, Ztar and Plaintiff executed a total of two loan extensions prior to 2022. Ztar always remained in compliance with the credit agreements.

12.     In the fall of 2021, as the latest amendment's January 2022 expiration date loomed, I met with Walker met at a Dallas restaurant to discuss another routine extension. During that conversation, Walker told me in no uncertain terms that Plaintiff would unquestionably extend the Loan Agreement for at least another year (at a minimum). He even said the next extension would include a more favorable interest rate. Once again, I assumed Walker was telling me the truth and took him for his word.

13.     Because I thought another year-plus-long extension was already approved by Plaintiff, I did not have any reason to seek a new lender to refinance Ztar's debt. I most certainly would have begun doing so if I knew that Walker was not telling me the truth. If I had contacted alternative lenders at that early time, I am sure I would have had no problem finding a substitute

lender for Ztar, which would have ended my relationship with Plaintiff on favorable terms and which would have avoided this lawsuit entirely.

14.     Sometime in early 2022, Plaintiff contacted me about what Plaintiff had suddenly deemed to be insufficient collateral securing the line of credit. I would later come to learn that, due to a massive internal error by Plaintiff, the bank had released the funds in the Canadian time-deposit account to another entity that was not a signatory to the Loan Agreement. Neither I nor any employee of Ztar had anything to do with the funds' release. I was therefore confused when Plaintiff's communications became increasingly threatening. It wasn't until early-March 2022 that I realized I needed to seek alternative lending.

15.     Ztar agreed to a short, 60-day loan extension, which I later learned was Plaintiff's measure to internally investigate its internal error and to vet Ztar's financials. Only toward the end of that 60-day extension did I learn — quite suddenly — that Plaintiff likely would not continue its lending relationship with Ztar. That is when, in March 2022, I first began trying to line up an alternative lender for Ztar. By that point, however, it was too late, and no other lender would extend credit to Ztar. The potential upcoming default disqualified Ztar from refinancing. Again, if I had begun searching for alternate lenders around the time of my meeting with Walker in 2021, I have no doubt I could have secured a different credit line and closed out my relationship with Plaintiff in compliance with the Loan Agreement.

16.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**DECLARATION OF KEVIN HADDAD**                                                          **Page 5**

Executed on May 24, 2024.


Kevin Haddad

# Exhibit 2





## LOAN AGREEMENT

This Agreement dated as of March 29, 2019, is between Bank of America, N.A. (the "Bank") and Ztar Mobile, Inc. (the "Borrower").

1.    DEFINITIONS

In addition to the terms which are defined elsewhere in this Agreement, the following terms have the meanings indicated for the purposes of this Agreement:

1.1    "Guarantor" means any person, if any, providing a guaranty with respect to the obligations hereunder.

1.2    "Obligor" means any Borrower, Guarantor and/or Pledgor, or if the Borrower is comprised of the trustees of a trust, any trustor.

1.3    "Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

1.4    "Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

1.3    "Pledgor" means any person, if any, providing a pledge of collateral with respect to the obligations hereunder

2.    FACILITY NO. 1: LINE OF CREDIT AMOUNT AND TERMS

2.1    Line of Credit Amount

(a)    During the availability period described below, the Bank will provide a line of credit to the Borrower (the "Line of Credit"). The amount of the Line of Credit (the "Facility No. 1 Commitment") is Six Million and 00/100 Dollars ($6,000,000.00).

(b)    This is a revolving line of credit. During the availability period, the Borrower may repay principal amounts and reborrow them.

(c)    The Borrower agrees not to permit the principal balance outstanding to exceed the Facility No. 1 Commitment. If the Borrower exceeds this limit, the Borrower will immediately pay the excess to the Bank upon the Bank's demand.

2.2    Availability Period. The Line of Credit is available between the date of this Agreement and May 31, 2020, or such earlier date as the availability may terminate as provided in this Agreement (the "Facility No. 1 Expiration Date").

The availability period for this Line of Credit will be considered renewed if and only if the Bank has sent to the Borrower a written notice of renewal for the Line of Credit (the "Renewal Notice"). If this Line of Credit is renewed, it will continue to be subject to all the terms and conditions set forth in this Agreement except as modified by the Renewal Notice. If this Line of Credit is renewed, the term "Expiration Date" shall mean the date set forth in the Renewal Notice as the Expiration Date and all outstanding principal plus all accrued interest shall be paid on the Expiration Date. The same process for renewal will apply to any subsequent renewal of this Line of Credit. A renewal fee may be charged at the Bank's option. The amount of the renewal fee will be specified in the Renewal Notice.

Ref #: 1002992568 : - Ztar Mobile, Inc
Standard Credit Agreement

1

BOA_001396

2.3    <u>Repayment Terms.</u>

(a)    The Borrower will pay interest on April 30, 2019, and then on the last day of each month thereafter until payment in full of all principal outstanding under this facility.  The amount of each interest payment shall be the amount of accrued interest on the Line of Credit as of the interest payment date or such earlier accrual date as indicated on the billing statement for such interest payment.

(b)    The Borrower will repay in full all principal, interest or other charges outstanding under this Agreement no later than the Expiration Date.

(c)    The Borrower may prepay the Line of Credit in full or in part at any time.  The prepayment will be applied to the most remote payment of principal due under this Agreement.

2.4    <u>Interest Rate.</u>

(a)    The interest rate is a rate per year equal to the lesser of (i) the maximum lawful rate of interest permitted under applicable usury laws, now or hereafter enacted (the "Maximum Rate"), or (ii) the LIBOR Daily Floating Rate plus 1.2 percentage point(s).

(b)    The LIBOR Daily Floating Rate is a fluctuating rate of interest which can change on each banking day.  The rate will be adjusted on each banking day to equal the London Interbank Offered Rate (or a comparable or successor rate which is approved by the Bank) for U.S. Dollar deposits for delivery on the date in question for a one month term beginning on that date.  The Bank will use the London Interbank Offered Rate as published by Bloomberg (or other commercially available source providing quotations of such rate as selected by the Bank from time to time) as determined at approximately 11:00 a.m. London time two (2) London Banking Days prior to the date in question, as adjusted from time to time in the Bank's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs.  If such rate is not available at such time for any reason, then the rate will be determined by such alternate method as reasonably selected by the Bank.  A "London Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars. If at any time the LIBOR Daily Floating Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

3.    COLLATERAL

3.1    <u>Personal Property.</u>  The personal property listed below now owned or owned in the future by the parties listed below will secure the Borrower's obligations to the Bank under this Agreement or, if the collateral is owned by a Guarantor, will secure the guaranty, if so indicated in the security agreement.  The collateral is further defined in security agreement(s) executed by the owners of the collateral

(a)    Equipment and fixtures owned by Ztar Mobile, Inc.

(b)    Inventory owned by Ztar Mobile, Inc.

(c)    Receivables owned by Ztar Mobile, Inc.

(d)    Time deposits with the Bank and owned by Ztar Mobile, Inc  in an amount not less than Six Million and 00/100 Dollars ($6,000,000.00).

4.    LOAN ADMINISTRATION AND FEES

4.1    <u>Fees.</u>

(a)    The Borrower will pay to the Bank the fees set forth on Schedule A.

(b)    <u>No Excess Fees.</u>  Notwithstanding anything to the contrary in this Agreement, in no event shall any sum payable under this Agreement (to the extent, if any, constituting interest under applicable laws), together with all other amounts

Ref #: 1002992568 : - Ztar Mobile, Inc
Standard Credit Agreement

2

BOA_001397

constituting interest under applicable laws and payable in connection with the credit evidenced hereby, exceed the amount of interest computed at the maximum lawful rate of interest permitted under applicable usury laws, now or hereafter enacted.

4.2    Collection of Payments; Payments Generally.

(a)    Payments will be made by debit to a deposit account, if direct debit is provided for in this Agreement or is otherwise authorized by the Borrower. For payments not made by direct debit, payments will be made by mail to the address shown on the Borrower's statement, or by such other method as may be permitted by the Bank

(b)    Each disbursement by the Bank and each payment by the Borrower will be evidenced by records kept by the Bank which will, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between the Borrower and the Bank.

(c)    All payments to be made by the Borrower shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff.

4.3    Borrower's Instructions.  Subject to the terms, conditions and procedures stated elsewhere in this Agreement, the Bank may honor instructions for advances or repayments and any other instructions under this Agreement given by the Borrower (if an individual), or by any one of the individuals the Bank reasonably believes is authorized to sign loan agreements on behalf of the Borrower, or any other individual(s) designated by any one of such authorized signers (each an "Authorized Individual"). The Bank may honor any such instructions made by any one of the Authorized Individuals, whether such instructions are given in writing or by telephone, telefax or Internet and intranet websites designated by the Bank with respect to separate products or services offered by the Bank.

4.4    Direct Debit.

(a)    The Borrower agrees that on the due date of any amount due under this Agreement, the Bank will debit the amount due from deposit account number TX-488025116274 owned by Ztar Mobile, Inc., or such other of the Borrower's accounts with the Bank as designated in writing by the Borrower (the "Designated Account"). Should there be insufficient funds in the Designated Account to pay all such sums when due, the full amount of such deficiency shall be immediately due and payable by the Borrower.

(b)    The Borrower may terminate this direct debit arrangement at any time by sending written notice to the Bank at the address specified at the end of this Agreement. If the Borrower terminates this arrangement, then the principal amount outstanding under this Agreement will at the option of the Bank bear interest at a rate per annum which is the lesser of (i) the Maximum Rate or (ii) 1.0 percentage point(s) higher than the rate of interest otherwise provided under this Agreement.

4.5    Banking Days.  Unless otherwise provided in this Agreement, a banking day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the state where the Bank's lending office is located, and, if such day relates to amounts bearing interest at an offshore rate (if any), means any such day on which dealings in dollar deposits are conducted among banks in the offshore dollar interbank market. All payments and disbursements which would be due or which are received on a day which is not a banking day will be due or applied, as applicable, on the next banking day.

4.6    Interest Calculation.  Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. This results in more interest or a higher fee than if a 365-day year is used. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid. To the extent that any calculation of interest or any fee required to be paid under this Agreement shall be less than zero, such rate shall be deemed zero for purposes of this Agreement.

4.7    Default Rate.  Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any unpaid interest, fees, or costs, will at the option of the Bank bear interest at a rate which is the lesser of (i) the Maximum Rate or (ii) 6.0

percentage point(s) higher than the rate of interest otherwise provided under this Agreement. This may result in compounding of interest  This will not constitute a waiver of any default.

5.    CONDITIONS

Before the Bank is required to extend any credit to the Borrower under this Agreement, it must receive any documents and other items it may reasonably require, in form and content acceptable to the Bank, including any items specifically listed below.

5.1    <u>Authorizations.</u>  If the Borrower or any other Obligor is anything other than a natural person, evidence that the execution, delivery and performance by the Borrower and/or such Obligor of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

5.2    <u>Governing Documents.</u>  If required by the Bank, a copy of the Borrower's organizational documents.

5.3    <u>Guaranties.</u>  Guaranty signed by Kevin T Haddad.

5.4    <u>Security Agreements.</u>  Signed original security agreements covering the personal property collateral which the Bank requires.

5.5    <u>Perfection and Evidence of Priority.</u>  Evidence that the security interests and liens in favor of the Bank are valid, enforceable, properly perfected in a manner acceptable to the Bank and prior to all others' rights and interests, except those the Bank consents to in writing.

5.6    <u>Payment of Fees</u>  Payment of all fees, expenses and other amounts due and owing to the Bank.  If any fee is not paid in cash, the Bank may, in its discretion, treat the fee as a principal advance under this Agreement or deduct the fee from the loan proceeds

5.7    <u>Good Standing.</u>  Certificates of good standing for the Borrower from its state of formation and from any other state in which the Borrower is required to qualify to conduct its business.

5.8    <u>Insurance.</u>  Evidence of insurance coverage, as required in the "Covenants" section of this Agreement.

5.9    <u>KYC Information.</u>

(a)    Upon the request of the Bank, the Borrower shall have provided to the Bank, and the Bank shall be reasonably satisfied with, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act

(b)    If the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, it shall have provided a Beneficial Ownership Certification to the Bank if so requested.

6.    REPRESENTATIONS AND WARRANTIES

When the Borrower signs this Agreement, and until the Bank is repaid in full, the Borrower makes the following representations and warranties. Each request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request:

6.1    <u>Formation</u>  If the Borrower is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

6.2    <u>Authorization.</u>  This Agreement, and any instrument or agreement required under this Agreement, are within the Borrower's powers, have been duly authorized, and do not conflict with any of its organizational papers.

6.3    <u>Good Standing.</u>  In each state in which the Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name (e.g. trade name or d/b/a) statutes

Ref #: 1002992568 : - Ztar Mobile, Inc.
Standard Credit Agreement

4

BOA_001399

6.4    Government Sanctions.

(a)    The Borrower represents that no Obligor, nor any affiliated entities of any Obligor, including in the case of any Obligor that is not a natural person, subsidiaries nor, to the knowledge of the Borrower, any owner, trustee, director, officer, employee, agent, affiliate or representative of the Borrower or any other Obligor is an individual or entity ("Person") currently the subject of any sanctions administered or enforced by the United States Government, including, without limitation, the U.S. Department of Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), nor is the Borrower or any other Obligor located, organized or resident in a country or territory that is the subject of Sanctions.

(b)    The Borrower represents and covenants that it will not, directly or indirectly, use the proceeds of the credit provided under this Agreement, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, to fund any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor or otherwise) of Sanctions.

6.5    Financial Information.  All financial and other information that has been or will be supplied to the Bank is sufficiently complete to give the Bank accurate knowledge of the Borrower's (and any other Obligor's) financial condition, including all material contingent liabilities.  Since the date of the most recent financial statement provided to the Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of the Borrower (or any other Obligor)  If the Borrower is comprised of the trustees of a trust, the above representations shall also pertain to the trustor(s) of the trust.

6.6    Lawsuits.  There is no lawsuit, tax claim or other dispute pending or threatened against the Borrower or any other Obligor which, if lost, would impair the Borrower's or such Obligor's financial condition or ability to repay its obligations as contemplated by this Agreement or any other agreement contemplated hereby, except as have been disclosed in writing to the Bank prior to the date of this Agreement.

6.7    Other Obligations.  The Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to the Bank prior to the date of this Agreement.

6.8    Tax Matters.  The Borrower has no knowledge of any pending assessments or adjustments of income tax for itself for any year and all taxes due have been paid, except as have been disclosed in writing to the Bank prior to the date of this Agreement.

6.9    PACE Financing.  The Borrower has not entered into any Property Assessed Clean Energy ("PACE") or similar energy efficiency or renewable energy financing and has no knowledge of any pending assessments or adjustments in connection therewith

6.10    Collateral.  All collateral required in this Agreement is owned by the grantor of the security interest free of any title defects or any liens or interests of others, except those which have been approved by the Bank in writing.

6.11    No Event of Default.  There is no event which is, or with notice or lapse of time or both would be, a default under this Agreement.

6.12    ERISA Plans.

(a)    Each Plan (other than a multiemployer plan) is in compliance in all material respects with ERISA, the Code and other federal or state law, including all applicable minimum funding standards and there have been no prohibited transactions with respect to any Plan (other than a multiemployer plan), which has resulted or could reasonably be expected to result in a material adverse effect.

(b)     With respect to any Plan subject to Title IV of ERISA:

    (i)     No reportable event has occurred under Section 4043(c) of ERISA which requires notice.

    (ii)    No action by the Borrower or any ERISA Affiliate to terminate or withdraw from any Plan has been taken and no notice of intent to terminate a Plan has been filed under Section 4041 or 4042 of ERISA.

(c)     The following terms have the meanings indicated for purposes of this Agreement:

    (i)     "Code" means the Internal Revenue Code of 1986, as amended.

    (ii)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

    (iii)   "ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code.

    (iv)    "Plan" means a plan within the meaning of Section 3(2) of ERISA maintained or contributed to by the Borrower or any ERISA Affiliate, including any multiemployer plan within the meaning of Section 4001(a)(3) of ERISA.

6.13    <u>No Plan Assets</u>. The Borrower represents that, as of the date hereof and throughout the term of this Agreement, no Borrower or Guarantor, if any, is (1) an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (2) a plan or account subject to Section 4975 of the Internal Revenue Code of 1986 (the "Code"); (3) an entity deemed to hold "plan assets" of any such plans or accounts for purposes of ERISA or the Code; or (4) a "governmental plan" within the meaning of ERISA.

6.14    <u>Enforceable Agreement</u>  This Agreement is a legal, valid and binding agreement of the Borrower, enforceable against the Borrower in accordance with its terms, and any instrument or agreement required under this Agreement, when executed and delivered, will be similarly legal, valid, binding and enforceable.

6.15    <u>No Conflicts.</u> This Agreement does not conflict with any law, agreement, or obligation by which the Borrower or any other Obligor is bound.

6.16    <u>Permits, Franchises.</u> The Borrower possesses all permits, memberships, franchises, contracts and licenses required and all trademark rights, trade name rights, patent rights, copyrights, and fictitious name rights necessary to enable it to conduct the business in which it is now engaged.

6.17    <u>Insurance.</u> The Borrower has obtained, and maintained in effect, the insurance coverage required in the "Covenants" section of this Agreement.

6.18    <u>Beneficial Ownership Certification</u>. The information included in the Beneficial Ownership Certification most recently provided to the Bank, if applicable, is true and correct in all respects.

7.      COVENANTS

The Borrower agrees, so long as credit is available under this Agreement and until the Bank is repaid in full, the Borrower shall:

7.1     <u>Use of Proceeds.</u>

(a)     To use the proceeds of the credit extended under this Agreement only for business purposes.

7.2     <u>Financial Information.</u> To provide the following financial information and statements in form and content acceptable to the Bank, and such additional information as requested by the Bank from time to time  The Bank reserves the right, upon written notice to the Borrower, to require the Borrower to deliver financial information and statements to the

Bank more frequently than otherwise provided below, and to use such additional information and statements to measure any applicable financial covenants in this Agreement.

(a)  Within 120 days of the fiscal year end, the annual financial statements of Ztar Mobile, Inc. These financial statements may be company-prepared. The statements shall be prepared on a consolidated basis.

(b)  Within 120 days of the end of each fiscal year, a compliance certificate of Ztar Mobile, Inc., signed by an authorized financial officer and setting forth (i) the information and computations (in sufficient detail) to establish compliance with all financial covenants at the end of the period covered by the financial statements then being furnished and (ii) whether there existed as of the date of such financial statements and whether there exists as of the date of the certificate, any default under this Agreement applicable to the party submitting the information and, if any such default exists, specifying the nature thereof and the action the party is taking and proposes to take with respect thereto.

(c)  Promptly upon the Bank's request, such other books, records, statements, lists of property and accounts, budgets, forecasts or reports as to the Borrower and as to each other Obligor as the Bank may request

7.3  <u>Financial Information - Individuals.</u>  To provide the following financial information and statements in form and content acceptable to the Bank, and such additional information as requested by the Bank from time to time  The Bank reserves the right, upon written notice to the Borrower, to require the Borrower to deliver financial information and statements to the Bank more frequently than otherwise provided below, and to use such additional information and statements to measure any applicable financial covenants in this Agreement.

(a)  Within 120 days of each calendar year-end, the annual financial statements of Kevin T. Haddad. These financial statements may be prepared by the party covered by the financial statements.

(b)  Such additional financial information regarding the Borrower or any other Obligor with respect to the loan as the Bank shall request.

The financial statements required above shall include a properly completed signed and dated personal financial statement on the Bank's form with all questions fully answered and all schedules completed in their entirety, including all requested income/expense information, contingent liabilities disclosure; provided that, if the Borrower or other party uses his/her own automated financial statement, they may supplement the statement with supporting schedules, certifications or other details so that all information requested on the Bank's financial statement form is provided in lieu of using such form

7.4  <u>Basic Fixed Charge Coverage Ratio.</u>  To maintain on a consolidated basis a Basic Fixed Charge Coverage Ratio of at least 1.25:1.0.

"Basic Fixed Charge Coverage Ratio" means the ratio of (a) the sum of EBITDA plus lease expense and rent expense, minus income tax, minus dividends, withdrawals, and other distributions, to (b) the sum of interest expense, lease expense, rent expense, the current portion of long term debt and the current portion of capitalized lease obligations.

"EBITDA" means net income, less income or plus loss from discontinued operations and extraordinary items, plus income taxes, plus interest expense, plus depreciation, depletion, and amortization.

This ratio will be calculated at the end of each reporting period for which the Bank requires financial statements, using the results of the twelve-month period ending with that reporting period. The current portion of long-term liabilities will be measured as of the date twelve (12) months prior to the current financial statement.

7.5  <u>Bank as Principal Depository</u>  To maintain the Bank or one of its affiliates as its principal depository bank, including for the maintenance of business, cash management, operating and administrative deposit accounts

7.6  <u>Other Debts.</u>  Not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to the Bank or to any affiliate of the Bank), or become liable for the liabilities of others, without the Bank's written consent. This does not prohibit:

Ref #: 1002992568 : - Ztar Mobile, Inc.
Standard Credit Agreement

7

BOA_001402

(a)     Acquiring goods, supplies, or merchandise on normal trade credit.

(b)     Liabilities, lines of credit and leases in existence on the date of this Agreement disclosed in writing to the Bank.

7.7     <u>Other Liens</u>.  Not to create, assume, or allow any security interest or lien (including judicial liens) on property the Borrower now or later owns without the Bank's written consent.  This does not prohibit:

(a)     Liens and security interests in favor of the Bank or any affiliate of the Bank.

(b)     Liens for taxes not yet due.

(c)     Liens outstanding on the date of this Agreement disclosed in writing to the Bank.

7.8     <u>Maintenance of Assets.</u>

(a)     Not to sell, assign, lease, transfer or otherwise dispose of any part of the Borrower's business or the Borrower's assets except inventory sold in the ordinary course of the Borrower's business.

(b)     Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

(c)     Not to enter into any sale and leaseback agreement covering any of its fixed assets.

(d)     To maintain and preserve all rights, privileges, and franchises the Borrower now has.

(e)     To make any repairs, renewals, or replacements to keep the Borrower's properties in good working condition.

(f)     To execute and deliver such documents as the Bank deems necessary to create, perfect and continue the security interests contemplated by this Agreement.

7.9     <u>Investments</u>.  Not to have any existing, or make any new, investments in any individual or entity, or make any capital contributions or other transfers of assets to any individual or entity, except for:

(a)     Existing investments disclosed to the Bank in writing prior to the date of this Agreement.

(b)     Investments in any of the following:

        (i)     certificates of deposit;

        (ii)    U.S. treasury bills and other obligations of the federal government;

        (iii)   readily marketable securities (including commercial paper, but excluding restricted stock and stock subject to the provisions of Rule 144 of the Securities and Exchange Commission).

7.10    <u>Loans</u>.  Not to make any loans, advances or other extensions of credit to any individual or entity, except for:

(a)     Existing extensions of credit disclosed to the Bank in writing prior to the date of this Agreement.

(b)     Extensions of credit to the Borrower's current subsidiaries or affiliates.

(c)     Extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to non-affiliated entities.

7.11    Change of Management.  Not to make any substantial change in the present executive or management personnel of the Borrower.

7.12    Change of Ownership.  Not to cause, permit, or suffer any change in capital ownership such that there is a change of more than twenty-five percent (25%) in the direct or indirect capital ownership of the Borrower.

7.13    Additional Negative Covenants.  Not to, without the Bank's written consent:

(a)     Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

(b)     Acquire or purchase a business or its assets.

(c)     Engage in any business activities substantially different from the Borrower's present business.

(d)     Liquidate or dissolve any Obligor's business.

(e)     Apply for or accept any PACE or similar energy efficiency or renewable energy financing.

(f)     Voluntarily suspend its business for more than seven (7) days in any thirty (30) day period.

7.14    Notices to Bank.  To promptly notify the Bank in writing of:

(a)     Any event of default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an event of default.

(b)     Any change in any Obligor's name, legal structure, principal residence, or name on any driver's license or special identification card issued by any state (for an individual), state of registration (for a registered entity), place of business, or chief executive office if the Obligor has more than one place of business.

7.15    Insurance.

(a)     General Business Insurance.  To maintain insurance satisfactory to the Bank as to amount, nature and carrier covering property damage (including loss of use and occupancy) to any of the Obligor's properties, business interruption insurance, public liability insurance including coverage for contractual liability, product liability and workers' compensation, and any other insurance which is usual for such Obligor's business.  Each policy shall include a cancellation clause in favor of the Bank

(b)     Insurance Covering Collateral.  To maintain all risk property damage insurance policies (including without limitation windstorm coverage, flood coverage, and hurricane coverage as applicable) covering the tangible property comprising the collateral.  Each insurance policy must be for the full replacement cost of the collateral and include a replacement cost endorsement.  The insurance must be issued by an insurance company acceptable to the Bank and must include a lender's loss payable endorsement in favor of the Bank in a form acceptable to the Bank.

(c)     Evidence of Insurance.  Upon the request of the Bank, to deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force.

7.16    Compliance with Laws.  To comply with the requirements of all laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to cause a material adverse change in any Obligor's business condition (financial or otherwise), operations or properties, or ability to repay the credit, or, in the case of the Controlled Substances Act, result in the forfeiture of any material property of any Obligor

7.17    Books and Records.  To maintain adequate books and records, including complete and accurate records regarding all Collateral

7.18    Audits   To allow the Bank and its agents to inspect the Borrower's properties and examine, audit, and make copies of books and records at any time.  If any of the Borrower's properties, books or records are in the possession of a third party, the Borrower authorizes that third party to permit the Bank or its agents to have access to perform inspections or audits and to respond to the Bank's requests for information concerning such properties, books and records.

7.19    Perfection of Liens.  To help the Bank perfect and protect its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

7.20    Cooperation.  To take any action reasonably requested by the Bank to carry out the intent of this Agreement.

7.21    No Consumer Purpose   Not to use this loan for personal, family, or household purposes.  The Bank may provide the Borrower (or any other Obligor) with certain disclosures intended for loans made for personal, family, or household purposes.  The fact that the Bank elects to make such disclosures shall not be deemed a determination by the Bank that the loan will be used for such purposes.

7.22    Cash Collateral.  The Borrower shall, and shall cause each Pledgor who has pledged cash, accounts, deposit accounts and/or securities accounts (or similar collateral) to secure the obligations under this Agreement to, not open, maintain or otherwise have any deposit or other accounts (including securities accounts) at any bank or other financial institution, or any other account where money or securities are or may be deposited or maintained with any person, other than (a) deposit accounts that are maintained at all times with depositary institutions as to which the Bank shall have received a satisfactory account control agreement, (b) securities accounts that are maintained at all times with financial institutions  as to which the Bank shall have received a satisfactory account control agreement, (c) deposit accounts established solely as payroll and other zero balance accounts and such accounts are held with the Bank and (d) other deposit accounts, so long as such accounts are held with the Bank.

7.23    Patriot Act; Beneficial Ownership Regulation.  Promptly following any request therefor, to provide information and documentation reasonably requested by the Bank for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation.

8.    DEFAULT AND REMEDIES

If any of the following events of default occurs, the Bank may do one or more of the following without prior notice except as required by law or expressly agreed in writing by Bank  declare the Borrower in default, stop making any additional credit available to the Borrower, and require the Borrower to repay its entire debt immediately   If an event which, with notice or the passage of time, will constitute an event of default has occurred and is continuing, the Bank has no obligation to make advances or extend additional credit under this Agreement.  In addition, if any event of default occurs, the Bank shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity.  If an event of default occurs under the paragraph entitled "Bankruptcy/Receivers," below with respect to any Obligor, then the entire debt outstanding under this Agreement will automatically be due immediately.

8.1    Failure to Pay.  The Borrower fails to make a payment under this Agreement when due.

8.2    Other Bank Agreements.  (i) Any default occurs under any other document executed or delivered in connection with this Agreement, including without limitation, any note, guaranty, subordination agreement, mortgage or other collateral agreement, (ii) any Obligor purports to revoke or disavow any guaranty or collateral agreement provided in connection with this Agreement, (iii) any representation or warranty made by any Obligor is false when made or deemed to be made, or (iv) any default occurs under any other agreement the Borrower (or any Obligor) or any of the Borrower's related entities or affiliates has with the Bank or any affiliate of the Bank.

8.3    Cross-default.  Any default occurs under any agreement in connection with any credit any Obligor has obtained from anyone else or which any Obligor has guaranteed.

Ref #: 1002992568 : - Ztar Mobile, Inc.
Standard Credit Agreement

10

BOA_001405

8.4    <u>False Information.</u>  The Borrower or any other Obligor has given the Bank false or misleading information or representations.

8.5    <u>Bankruptcy/Receivers.</u>  Any Obligor or any general partner of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties, or any Obligor, or any general partner of any Obligor makes a general assignment for the benefit of creditors; or a receiver or similar official is appointed for a substantial portion of any Obligor's business; or the business is terminated, or such Obligor is liquidated or dissolved.

8 6    <u>Lien Priority.</u>  The Bank fails to have an enforceable first lien (except for any prior liens to which the Bank has consented in writing) on or security interest in any property given as security for this Agreement (or any guaranty)

8.7    <u>Judgments.</u>  Any judgments or arbitration awards are entered against any Obligor in an aggregate amount of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000 00) or more

8.8    <u>Death.</u>  If any Obligor is a natural person, such Obligor dies or becomes legally incompetent; if any Obligor is a trust, a trustor dies or becomes legally incompetent; if any Obligor is a partnership, any general partner dies or becomes legally incompetent.

8.9    <u>Material Adverse Change.</u>  A material adverse change occurs, or is reasonably likely to occur, in any Obligor's business condition (financial or otherwise), operations or properties, or ability to repay its obligations as contemplated hereunder or under any document executed in connection with this Agreement.

8.10    <u>Government Action.</u>  Any government authority takes action that the Bank believes materially adversely affects any Obligor's financial condition or ability to repay.

8.11    <u>ERISA Plans.</u>  A reportable event occurs under Section 4043(c) of ERISA, or any Plan termination (or commencement of proceedings to terminate a Plan) or the full or partial withdrawal from a Plan under Section 4041 or 4042 of ERISA occurs; provided such event or events could reasonably be expected, in the judgment of the Bank, to have a material adverse effect.

8.12    <u>Covenants.</u>  Any default in the performance of or compliance with any obligation, agreement or other provision contained in this Agreement (other than those specifically described as an event of default in this Article).

8.13    <u>Forfeiture.</u>  A judicial or nonjudicial forfeiture or seizure proceeding is commenced by a government authority and remains pending with respect to any property of Borrower or any part thereof, on the grounds that the property or any part thereof had been used to commit or facilitate the commission of a criminal offense by any person, including any tenant, pursuant to any law, including under the Controlled Substances Act or the Civil Asset Forfeiture Reform Act, regardless of whether or not the property shall become subject to forfeiture or seizure in connection therewith.

9.    ENFORCING THIS AGREEMENT; MISCELLANEOUS

9.1    <u>GAAP.</u>  Except as otherwise stated in this Agreement, all financial information provided to the Bank and all financial covenants will be made under generally accepted accounting principles, consistently applied; provided, however, leases shall continue to be classified and accounted for on a basis consistent with that reflected in the financial statements of the Borrower for the most recently ended fiscal year prior to the date of this Agreement for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes.

9.2    <u>Governing Law.</u>  Except to the extent that any law of the United States may apply, this Agreement shall be governed and interpreted according to the laws of Texas (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of the Bank under federal law.

9.3    <u>Venue and Jurisdiction.</u>  The Borrower agrees that any action or suit against the Bank arising out of or relating to this Agreement shall be filed in federal court or state court located in the Governing Law State  The Borrower agrees that

the Bank shall not be deemed to have waived its rights to enforce this section by filing an action or suit against the Borrower or any Obligor in a venue outside of the Governing Law State. If the Bank does commence an action or suit arising out of or relating to this Agreement, the Borrower agrees that the case may be filed in federal court or state court in the Governing Law State. The Bank reserves the right to commence an action or suit in any other jurisdiction where any Borrower, any other Obligor, or any Collateral has any presence or is located. The Borrower consents to personal jurisdiction and venue in such forum selected by the Bank and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this section are material inducements to the Bank's acceptance of this Agreement.

9.4 Successors and Assigns. This Agreement is binding on the Borrower's and the Bank's successors and assignees. The Borrower agrees that it may not assign this Agreement without the Bank's prior consent The Bank may sell participations in or assign this loan and the related loan documents, and may exchange information about the Borrower and any other Obligor (including, without limitation, any information regarding any hazardous substances) with actual or potential participants or assignees If a participation is sold or the loan is assigned, the purchaser will have the right of set-off against the Borrower.

9 5 Maximum Rate. It is the intention of the parties to comply with applicable usury laws. The parties agree that the total amount of interest contracted for, charged, collected or received by the Bank under this Agreement shall not exceed the Maximum Rate. To the extent, if any, that Chapter 303 of the Texas Finance Code (the "Code") is relevant to the Bank for purposes of determining the Maximum Rate, the parties elect to determine the Maximum Rate under the Code pursuant to the "weekly ceiling" from time to time in effect, as referred to and defined in § 303.001-303 016 of the Code; subject, however, to any right the Bank subsequently may have under applicable law to change the method of determining the Maximum Rate. Notwithstanding any contrary provisions contained herein, (a) the Maximum Rate shall be calculated on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be; (b) in determining whether the interest hereunder exceeds interest at the Maximum Rate, the total amount of interest shall be spread throughout the entire term of this Agreement until its payment in full; (c) if at any time the interest rate chargeable under this Agreement would exceed the Maximum Rate, thereby causing the interest payable under this Agreement to be limited to the Maximum Rate, then any subsequent reductions in the interest rate(s) shall not reduce the rate of interest charged under this Agreement below the Maximum Rate until the total amount of interest accrued from and after the date of this Agreement equals the amount of interest which would have accrued if the interest rate(s) had at all times been in effect; (d) if the Bank ever charges or receives anything of value which is deemed to be interest under applicable Texas law, and if the occurrence of any event, including acceleration of maturity of obligations owing to the Bank, should cause such interest to exceed the maximum lawful amount, any amount which exceeds interest at the Maximum Rate shall be applied to the reduction of the unpaid principal balance under this Agreement or any other indebtedness owed to the Bank by the Borrower, and if this Agreement and such other indebtedness are paid in full, any remaining excess shall be paid to the Borrower; and (e) Chapter 346 of the Code shall not be applicable to this Agreement or the indebtedness outstanding hereunder.

9.6 **Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

9.7 Waiver of Class Actions. The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N A , its subsidiaries and affiliates, on the one hand, and the other parties to this Agreement, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in

an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

9.8    Severability, Waivers.  If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced.  The Bank retains all rights, even if it makes a loan after default.  If the Bank waives a default, it may enforce a later default.  Any consent or waiver under this Agreement must be in writing.

9.9    Expenses.

(a)    The Borrower shall pay to the Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, expended or incurred by the Bank in connection with (i) the negotiation and preparation of this Agreement and any related agreements, the Bank's continued administration of this Agreement and such related agreements, and the preparation of any amendments and waivers related to this Agreement or such related agreements, (ii) filing, recording and search fees, appraisal fees, field examination fees, title report fees, and documentation fees with respect to any collateral and books and records of the Borrower or any other Obligor, (iii) the Bank's costs or losses arising from any changes in law which are allocated to this Agreement or any credit outstanding under this Agreement, and (iv) costs or expenses required to be paid by the Borrower or any other Obligor that are paid, incurred or advanced by the Bank.

(b)    The Borrower will indemnify and hold the Bank harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (i) this Agreement or any document required hereunder, (ii) any credit extended or committed by the Bank to the Borrower hereunder, and (iii) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit, including, without limitation, any act resulting from the Bank complying with instructions the Bank reasonably believes are made by any Authorized Individual, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE** (as defined herein); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  This paragraph will survive this Agreement's termination, and will benefit the Bank and its officers, employees, and agents (each such person or entity referred to as "Indemnitee").

(c)    The Borrower shall reimburse the Bank for any reasonable costs and attorneys' fees incurred by the Bank in connection with (a) the enforcement or preservation of the Bank's rights and remedies and/or the collection of any obligations of the Borrower which become due to the Bank and in connection with any "workout" or restructuring, and (b) the prosecution or defense of any action in any way related to this Agreement, the credit provided hereunder or any related agreements, including without limitation, any action for declaratory relief, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by the Bank or any other person) relating to the Borrower or any other person or entity.

9 10    Individual Liability.  If the Borrower is a natural person, the Bank may proceed against the Borrower's business and non-business property in enforcing this and other agreements relating to this loan.  If the Borrower is a partnership, the Bank may proceed against the business and non-business property of each general partner of the Borrower in enforcing this and other agreements relating to this loan.

9.11    Set-Off.  Upon and after the occurrence of an event of default under this Agreement, (a) the Borrower hereby authorizes the Bank at any time without notice and whether or not the Bank shall have declared any amount owing by the Borrower to be due and payable, to set off against, and to apply to the payment of, the Borrower's indebtedness and obligations to the Bank under this Agreement and all related agreements, whether matured or unmatured, fixed or contingent, liquidated or unliquidated, any and all amounts owing by the Bank to the Borrower, and in the case of deposits, whether general or special (except trust and escrow accounts), time or demand and however evidenced, and (b) pending any such action, to hold such amounts as collateral to secure such indebtedness and obligations of the Borrower

Ref #: 1002992568 · - Ztar Mobile, Inc.
Standard Credit Agreement

13

BOA_001408

to the Bank and to return as unpaid for insufficient funds any and all checks and other items drawn against any deposits so held as the Bank, in its sole discretion, may elect   The Borrower hereby grants to the Bank a security interest in all deposits and accounts maintained with the Bank to secure the payment of all such indebtedness and obligations of the Borrower to the Bank.

9.12    One Agreement.  This Agreement and any related security or other agreements required by this Agreement constitute the entire agreement between the Borrower and the Bank with respect to each credit subject hereto and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter hereof. In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

9.13    Notices.  Unless otherwise provided in this Agreement or in another agreement between the Bank and the Borrower, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or sent by facsimile to the fax number(s) listed on the signature page, or to such other addresses as the Bank and the Borrower may specify from time to time in writing.  Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

9.14    Headings.  Article and paragraph headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

9.15    Counterparts.  This Agreement may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original, and all of which when taken together shall constitute one and the same Agreement.  Delivery of an executed counterpart of this Agreement (or of any agreement or document required by this Agreement and any amendment to this Agreement) by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Agreement; provided, however, that the telecopy or other electronic image shall be promptly followed by an original if required by the Bank.

9.16    Borrower/Obligor Information; Reporting to Credit Bureaus.  The Borrower authorizes the Bank at any time to verify or check any information given by the Borrower to the Bank, check the Borrower's credit references, verify employment, and obtain credit reports and other credit bureau information from time to time in connection with the administration, servicing and collection of the loans under this Agreement.  The Borrower agrees that the Bank shall have the right at all times to disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Borrower and all other Obligors as is consistent with the Bank's policies and practices from time to time in effect.

9.17    Customary Advertising Material.  The Borrower consents to the publication by the Bank of customary advertising material relating to the transactions contemplated hereby using the name, product photographs, logo or trademark of the Borrower.

9.18    Amendment and Restatement of Prior Agreement.  This Agreement is an amendment and restatement, in its entirety, of the Loan Agreement entered into as of June 14, 2012, between the Bank and the Borrower, and any indebtedness outstanding thereunder shall be deemed to be outstanding under this Agreement.  Nothing in this Agreement shall be deemed to be a repayment or novation of the indebtedness, or to release or otherwise adversely affect any lien, mortgage or security interest securing such indebtedness or any rights of the Bank against any guarantor, surety or other party primarily or secondarily liable for such indebtedness.

9.19    Amendments.  This Agreement may be amended or modified only in writing signed by each party hereto.

9.20    **Notice of Final Agreement.  THIS WRITTEN LOAN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Ref #: 1002992568 : - Ztar Mobile, Inc
Standard Credit Agreement

14

This Agreement is executed as of the date stated at the top of the first page.

Bank:

**Bank of America, N.A.**

By: _____

Andrew S. Walker, Vice President

Borrower:

**Ztar Mobile, Inc.**

By: _____

Kevin T. Haddad, Chief Executive Officer

Address where notices to Ztar Mobile, Inc. are to be sent:

325 North Saint Paul Street Suite 3450
Dallas, TX 75201

Address where notices to the Bank are to be sent:

Bank of America, N.A.
NC1-001-05-13
One Independence Center
101 North Tryon Street
Charlotte, NC 28255-0001

*Federal law requires Bank of America, N.A. (the "Bank") to provide the following notice. The notice is not part of the foregoing agreement or instrument and may not be altered. Please read the notice carefully.*

**(1)      USA PATRIOT ACT NOTICE**

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan.  The Bank will ask for the Borrower's legal name, address, tax ID number or social security number and other identifying information   The Bank may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of the Borrower, guarantors or other related persons.

## SCHEDULE A

### FEES

The Borrower will pay to the Bank the fees set forth on Schedule A.

(a)    Waiver Fee.  If the Bank, at its discretion, agrees to waive or amend any terms of this Agreement, the Borrower will, at the Bank's option, pay the Bank a fee for each waiver or amendment in an amount advised by the Bank at the time the Borrower requests the waiver or amendment.  Nothing in this paragraph shall imply that the Bank is obligated to agree to any waiver or amendment requested by the Borrower.  The Bank may impose additional requirements as a condition to any waiver or amendment.

(b)    Late Fee.  To the extent permitted by law, the Borrower agrees to pay a late fee in an amount not to exceed four percent (4%) of any payment that is more than fifteen (15) days late.  The imposition and payment of a late fee shall not constitute a waiver of the Bank's rights with respect to the default.

(c)    Returned Payment Fee.  The Bank, in its discretion, may collect from the Borrower a returned payment fee each time a payment is returned or if there are insufficient funds in the designated account when a payment is attempted through automatic payment.

Ref #: 1002992568 : - Ztar Mobile, Inc.
Standard Credit Agreement

16

BOA_001411

Case 3:23-cv-00826-BN Document 48-1 Filed 06/13/24 Page 28 of 100 PageID 514

DocuSign Envelope ID: 237CF7A0-9AB7-41B9-B959-065AF9B3A3F8

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



**BANK OF AMERICA**

AMENDMENT NO. 2 LOAN AGREEMENT

This Amendment No. 2 (the "Amendment") dated as of January 28, 2021, is between Bank of America, N.A. (the "Bank") and Ztar Mobile, Inc. (the "Borrower").

RECITALS

A.  The Bank and the Borrower entered into a certain Loan Agreement dated as of March 29, 2019 (together with any previous amendments, the "Agreement").  The current commitment amount of Facility No. 1 is $6,000,000.00.

B.  The Bank and the Borrower desire to amend the Agreement.  This Amendment shall be effective on January 31, 2021, subject to any conditions stated in this Amendment.

AGREEMENT

1.  <u>Definitions</u>.  Capitalized terms used but not defined in this Amendment shall have the meaning given to them in the Agreement.

2.  <u>Amendments</u>.  The Agreement is hereby amended as follows:

2.1    In Paragraph 2.2 (<u>Availability Period</u>) the date "January 31, 2021" is changed to "January 31, 2022".

2.2    Paragraph 2.4 is hereby amended to read in its entirety as follows:

2.4    <u>Interest Rate</u>.

(a)    The interest rate is a rate per year equal to the lesser of (i) the maximum lawful rate of interest permitted under applicable usury laws, now or hereafter enacted (the "Maximum Rate") or, (ii) the sum of (A) the greater of the LIBOR Daily Floating Rate or the Index Floor, plus (B) 2.55 percentage point(s).  For the purposes of this paragraph, "Index Floor" means 0.75 percent.

(b)    The LIBOR Daily Floating Rate is a fluctuating rate of interest which can change on each banking day.  The rate will be adjusted on each banking day to equal the London Interbank Offered Rate (or a comparable or successor rate which is approved by the Bank) for U.S. Dollar deposits for delivery on the date in question for a one month term beginning on that date.  The Bank will use the London Interbank Offered Rate as published by Bloomberg (or other commercially available source providing quotations of such rate as selected by the Bank from time to time) as determined at approximately 11:00 a.m. London time two (2) London Banking Days prior to the date in question, as adjusted from time to time in the Bank's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs.  If such rate is not available at such time for any reason, then the rate will be determined by such alternate method as reasonably selected by the Bank.  A "London Banking Day" is a day on which banks in London are open for business and dealing in offshore

Ref #: 1003373888 : - Ztar Mobile, Inc.
Amendment to Loan Agreement

BOA_001412

THIS IS A COPY.
This is a copy view of the Authoritative Copy held by the designated custodian

dollars. If at any time the LIBOR Daily Floating Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

2.3     The paragraph 7.2 "Financial Information" is hereby amended to read in its entirety as follows:

7.2    Financial Information.  To provide the following financial information and statements in form and content acceptable to the Bank, and such additional information as requested by the Bank from time to time.  The Bank reserves the right, upon written notice to the Borrower, to require the Borrower to deliver financial information and statements to the Bank more frequently than otherwise provided below, and to use such additional information and statements to measure any applicable financial covenants in this Agreement.

(a)     Within 120 days of the fiscal year end, the annual financial statements of the Borrower.  These financial statements may be company-prepared.  The statements shall be prepared on a consolidated basis.

(b)     Promptly upon the Bank's request, such other books, records, statements, lists of property and accounts, budgets, forecasts or reports as to the Borrower and as to each other Obligor as the Bank may request.

2.4     The paragraph 7.3 "Financial Information – Individuals" is hereby amended to read in its entirety as follows:

7.3    Financial Information – Individuals.  To provide the following financial information and statements in form and content acceptable to the Bank, and such additional information as requested by the Bank from time to time.  The Bank reserves the right, upon written notice to the Borrower, to require the Borrower to deliver financial information and statements to the Bank more frequently than otherwise provided below, and to use such additional information and statements to measure any applicable financial covenants in this Agreement.

(a)     Within 120 days of each calendar year-end, the annual financial statements of Kevin T. Haddad.  These financial statements may be prepared by the party covered by the financial statements.

(b)     Such additional financial information regarding the Borrower or any other Obligor with respect to the loan as the Bank shall request.

The financial statements required above shall include a properly completed signed and dated personal financial statement on the Bank's form with all questions fully answered and all schedules completed in their entirety, including all requested income/expense information, contingent liabilities disclosure; provided that, if the Borrower or other party uses his/her own automated financial statement, they may supplement the statement with supporting schedules, certifications or other details so that all information requested on the Bank's financial statement form is provided in lieu of using such form.

3.  Representations and Warranties.  When the Borrower signs this Amendment, the Borrower represents and warrants to the Bank that:  (a) there is no event which is, or with notice or lapse of time or both would be, a default under the Agreement except those events, if any, that have been disclosed in writing to the Bank or waived in writing by the Bank, (b) the representations and warranties in the Agreement are true as of the date of this Amendment as if made on the date of this Amendment, (c) this Amendment does not conflict with any law, agreement, or obligation by which the Borrower is bound, (d) if the Borrower is a business entity or a trust, this Amendment is within the Borrower's powers, has been duly authorized, and does not conflict with any of the Borrower's organizational papers, (e) the information included in the Beneficial Ownership Certification most

Ref #: 1003373888 : - Ztar Mobile, Inc.
Amendment to Loan Agreement

BOA_001413

DocuSign Envelope ID: 23-CV-00826-BN9-B95C-0B8F9E91B9E3
THIS IS A COPY.
This is a copy view of the Authoritative Copy held
by the designated custodian

recently provided to the Bank, if applicable, is true and correct in all respects, and (f) as of the date of this Amendment and throughout the term of the Agreement, no Borrower or Guarantor, if any, is (1) an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (2) a plan or account subject to Section 4975 of the Internal Revenue Code of 1986 (the "Code"); (3) an entity deemed to hold "plan assets" of any such plans or accounts for purposes of ERISA or the Code; or (4) a "governmental plan" within the meaning of ERISA.

4.  Conditions.  The effectiveness of this Amendment is conditioned upon the Bank's receipt of the following items, in form and content acceptable to the Bank:

4.1     A fully executed counterpart of this Amendment from the Borrower and each guarantor and/or collateral pledgor (collectively, a "Credit Support Provider") in form satisfactory to the Bank.

4.2     KYC Information.

(a)     Upon the request of the Bank, the Borrower shall have provided to the Bank, and the Bank shall be reasonably satisfied with, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including without limitation, the PATRIOT Act.

(b)     If the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, it shall have provided a Beneficial Ownership Certification to the Bank if so requested.

4.3     If the Borrower or any Credit Support Provider is anything other than a natural person, evidence that the execution, delivery and performance by the Borrower and/or such Credit Support Provider of this Amendment and any instrument or agreement required under this Amendment have been duly authorized.

5.  Effect of Amendment.  Except as provided in this Amendment, all of the terms and conditions of the Agreement, including but not limited to any Waiver of Jury Trial or Dispute Resolution Provision contained therein, shall remain in full force and effect.

6.  Electronic Records and Signatures.  This Amendment and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Amendment (each a "Communication"), including Communications required to be in writing, may, if agreed by the Bank, be in the form of an Electronic Record and may be executed using Electronic Signatures, including, without limitation, facsimile and/or .pdf.  The Borrower agrees that any Electronic Signature (including, without limitation, facsimile or .pdf) on or associated with any Communication shall be valid and binding on the Borrower to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered to the Bank.  Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication.  For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention.  The Bank may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the ordinary course of the Bank's business, and destroy the original paper document.  All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record.  Notwithstanding anything contained herein to the contrary, the Bank is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Bank pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Bank has agreed to accept such Electronic Signature, the Bank shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Obligor without further verification and (b) upon the request of the Bank any Electronic Signature shall be promptly followed by a manually executed, original

Ref #: 1003373888 : - Ztar Mobile, Inc.
Amendment to Loan Agreement

- 3 -

BOA_001414

DocuSign Envelope ID: 237CFFA0-9D49-7BA9-B952-D05BF9639B43

THIS IS A COPY.
This is a copy view of the Authoritative Copy held
by the designated custodian

counterpart.  For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

**7.  FINAL AGREEMENT.  BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT:  (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

**8.  Notice of Final Agreement.  THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

This Amendment is executed as of the date stated at the beginning of this Amendment.

Bank:

**Bank of America, N.A.**

By: _Andrew Walker_ _____
    Andrew Walker, Vice President


Borrower:

**Ztar Mobile, Inc.**

By: _Kevin T. Haddad_ _____
    Kevin T. Haddad, Chief Executive Officer

DocuSign Envelope ID: 237C47A0-8269-7BN-B952C0849868B3

THIS IS A COPY.
This is a copy view of the Authoritative Copy held
by the designated custodian

## CONSENT AND REAFFIRMATION
## OF GUARANTORS AND PLEDGORS

Each of the undersigned (collectively referred to as the "Credit Support Providers") is a guarantor of, and/or is a pledgor of collateral for, the Borrower's obligations to the Bank under the Agreement.  Each Credit Support Provider hereby (i) acknowledges and consents to the foregoing Amendment, (ii) reaffirms its obligations under its respective guaranty in favor of the Bank and/or under any agreement under which it has granted to the Bank a lien or security interest in any of its real or personal property, and (iii) confirms that such guaranty and other agreements, including but not limited to any Waiver of Jury Trial or Dispute Resolution Provision contained therein, remain in full force and effect, without defense, offset, or counterclaim.  (Capitalized terms used herein shall have the meanings specified in the foregoing Amendment.)

Although each of the undersigned has been informed of the terms of the Amendment, each understands and agrees that the Bank has no duty to so notify it or any other guarantor/pledgor or to seek this or any future acknowledgment, consent or reaffirmation, and nothing contained herein shall create or imply any such duty as to any transactions, past or future.

Dated as of January 28, 2021

Credit Support Provider:

DocuSigned by:

*Kevin T. Haddad*

—900D28D1E137472—
Kevin T. Haddad, Individually

Ref #: 1003373888 : - Ztar Mobile, Inc.
Amendment to Loan Agreement

- 5 -

Appendix Page 31

BOA_001416

Case 3:23-cv-00826-BN   Document 48-1    Filed 06/13/24    Page 33 of 100   PageID 519
DocuSign Envelope ID: 2BC2D7D0-08E2-47B5-BFE8-D9E4106F4EA4
THIS IS A COPY.
This is a copy view of the Authoritative Copy held
by the designated custodian



**BANK OF AMERICA** 🇦

## AMENDMENT NO. 1 LOAN AGREEMENT

This Amendment No. 1 (the "Amendment") dated as of October 2, 2020, is between Bank of America, N.A. (the "Bank") and Ztar Mobile, Inc. (the "Borrower").

### RECITALS

A.  The Bank and the Borrower entered into a certain Loan Agreement dated as of March 29, 2019 (together with any previous amendments, the "Agreement").  The current commitment amount of Facility No. 1 is $6,000,000.00.

B.  The Bank and the Borrower desire to amend the Agreement.  This Amendment shall be effective on October 2, 2020, subject to any conditions stated in this Amendment.

### AGREEMENT

1.  <u>Definitions</u>.  Capitalized terms used but not defined in this Amendment shall have the meaning given to them in the Agreement.

2.  <u>Amendments</u>.  The Agreement is hereby amended as follows:

2.1      In Paragraph 2.2 the date "July 30, 2020" is changed to "January 31, 2021".

2.2      Paragraph 2.4 is hereby amended to read in its entirety as follows:

2.4      <u>Interest Rate.</u>

(a)      The interest rate is a rate per year equal to the sum of (i) the greater of the LIBOR Daily Floating Rate or the Index Floor, plus 3.10 percentage point(s).  For the purposes of this paragraph, "Index Floor" means 1.00 percent.

(b)      The LIBOR Daily Floating Rate is a fluctuating rate of interest which can change on each banking day.  The rate will be adjusted on each banking day to equal the London Interbank Offered Rate (or a comparable or successor rate which is approved by the Bank) for U.S. Dollar deposits for delivery on the date in question for a one month term beginning on that date.  The Bank will use the London Interbank Offered Rate as published by Bloomberg (or other commercially available source providing quotations of such rate as selected by the Bank from time to time) as determined at approximately 11:00 a.m. London time two (2) London Banking Days prior to the date in question, as adjusted from time to time in the Bank's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs.  If such rate is not available at such time for any reason, then the rate will be determined by such alternate method as reasonably selected by the Bank.  A "London Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars. If at any time the LIBOR Daily Floating Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

Ref #: 1003320011 : - Ztar Mobile Inc
Amendment to Loan Agreement

Appendix Page 32

BOA_001417

Case 3:23-cv-00826-BN   Document 48-1    Filed 06/13/24    Page 34 of 100   PageID 520

DocuSign Envelope ID: ...

EXHIBIT COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

2.3     The parties agree that, with respect to the Borrower or any Obligor which is a business entity, not to, without the Bank's written consent, adopt a plan of division or divide itself into two or more business entities (pursuant to a "plan of division" under Section 18-217 of the Delaware Limited Liability Company Act or a similar arrangement under any other applicable state statute).

2.4     Paragraph 9.13 is hereby amended to read in its entirety as follows:

Notices.  Unless otherwise provided in this Agreement or in another agreement between the Bank and the Borrower, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or sent by facsimile to the fax number(s) listed on the signature page, or to such other addresses as the Bank and the Borrower may specify from time to time in writing (any such notice a "Written Notice"). Written Notices shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.  In lieu of a Written Notice, notices and/or communications from the Bank to the Borrower may, to the extent permitted by law, be delivered electronically (i) by transmitting the communication to the electronic address provided by the Borrower or to such other electronic address as the Borrower may specify from time to time in writing, or (ii) by posting the communication on a website and sending the Borrower a notice to the Borrower's postal address or electronic address telling the Borrower that the communication has been posted, its location, and providing instructions on how to view it (any such notice, an "Electronic Notice").  Electronic Notices shall be effective when the communication, or a notice advising of its posting to a website, is sent to the Borrower's electronic address.

3.  Representations and Warranties.  When the Borrower signs this Amendment, the Borrower represents and warrants to the Bank that:  (a) there is no event which is, or with notice or lapse of time or both would be, a default under the Agreement except those events, if any, that have been disclosed in writing to the Bank or waived in writing by the Bank, (b) the representations and warranties in the Agreement are true as of the date of this Amendment as if made on the date of this Amendment, (c) this Amendment does not conflict with any law, agreement, or obligation by which the Borrower is bound, (d) if the Borrower is a business entity or a trust, this Amendment is within the Borrower's powers, has been duly authorized, and does not conflict with any of the Borrower's organizational papers, (e) the information included in the Beneficial Ownership Certification most recently provided to the Bank, if applicable, is true and correct in all respects, and (f) as of the date of this Amendment and throughout the term of the Agreement, no Borrower or Guarantor, if any, is (1) an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (2) a plan or account subject to Section 4975 of the Internal Revenue Code of 1986 (the "Code"); (3) an entity deemed to hold "plan assets" of any such plans or accounts for purposes of ERISA or the Code; or (4) a "governmental plan" within the meaning of ERISA.

4.  Conditions.  The effectiveness of this Amendment is conditioned upon the Bank's receipt of the following items, in form and content acceptable to the Bank:

4.1     A fully executed counterpart of this Amendment from the Borrower and each guarantor and/or collateral pledgor (collectively, a "Credit Support Provider") in form satisfactory to the Bank.

4.2     KYC Information.

(a)     Upon the request of the Bank, the Borrower shall have provided to the Bank, and the Bank shall be reasonably satisfied with, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act.

(b)     If the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, it shall have provided a Beneficial Ownership Certification to the Bank if so requested.

Ref #: 1003320011 : - Ztar Mobile Inc
Amendment to Loan Agreement

BOA_001418

Case 3:23-cv-00826-BN   Document 48-1    Filed 06/13/24    Page 35 of 100   PageID 521
DocuSign Envelope ID: ... BFE... 3...

THIS IS A COPY.
This is a copy view of the Authoritative Copy held
by the designated custodian

4.3     If the Borrower or any Credit Support Provider is anything other than a natural person, evidence that the execution, delivery and performance by the Borrower and/or such Credit Support Provider of this Amendment and any instrument or agreement required under this Amendment have been duly authorized.

4.4     A Resolutions to Obtain Credit signed by the Borrower.

5.  Effect of Amendment.  Except as provided in this Amendment, all of the terms and conditions of the Agreement, including but not limited to any Waiver of Jury Trial or Dispute Resolution Provision contained therein, shall remain in full force and effect.

6.  Electronic Records and Signatures.  This Amendment and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Amendment (each a "Communication"), including Communications required to be in writing, may, if agreed by the Bank, be in the form of an Electronic Record and may be executed using Electronic Signatures, including, without limitation, facsimile and/or .pdf.  The Borrower agrees that any Electronic Signature (including, without limitation, facsimile or .pdf) on or associated with any Communication shall be valid and binding on the Borrower to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered to the Bank.  Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication.  For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention.  The Bank may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the ordinary course of the Bank's business, and destroy the original paper document.  All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record.  Notwithstanding anything contained herein to the contrary, the Bank is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Bank pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Bank has agreed to accept such Electronic Signature, the Bank shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Obligor without further verification and (b) upon the request of the Bank any Electronic Signature shall be promptly followed by a manually executed, original counterpart.  For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

**7.  FINAL AGREEMENT.  BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT:  (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

**8.  Notice of Final Agreement.  THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Ref #: 1003320011 : - Ztar Mobile Inc
Amendment to Loan Agreement

BOA_001419

DocuSign Envelope ID: 23BC37D0-9B26-436D-BFE8-0B34095FF1E4

THIS IS A COPY VIEW
This is a copy view of the Authoritative Copy held
by the designated custodian

This Amendment is executed as of the date stated at the beginning of this Amendment.

Bank:

**Bank of America, N.A.**

By: Andrew Walker

Andrew Walker, Vice President

Borrower:

**Ztar Mobile, Inc.**

By: Kevin T. Haddad

Kevin T. Haddad, Chief Executive Officer

Case 3:23-cv-00826-BN Document 48-1    Filed 06/13/24    Page 37 of 100    PageID 523
DocuSign Envelope ID: 23DC9756-0852-40EB-BFEB-99CB405B11EA

STRIKED COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## CONSENT AND REAFFIRMATION
## OF GUARANTORS AND PLEDGORS

        Each of the undersigned (collectively referred to as the "Credit Support Providers") is a guarantor of, and/or is a pledgor of collateral for, the Borrower's obligations to the Bank under the Agreement.  Each Credit Support Provider hereby (i) acknowledges and consents to the foregoing Amendment, (ii) reaffirms its obligations under its respective guaranty in favor of the Bank and/or under any agreement under which it has granted to the Bank a lien or security interest in any of its real or personal property, and (iii) confirms that such guaranty and other agreements, including but not limited to any Waiver of Jury Trial or Dispute Resolution Provision contained therein, remain in full force and effect, without defense, offset, or counterclaim.  (Capitalized terms used herein shall have the meanings specified in the foregoing Amendment.)

        Although each of the undersigned has been informed of the terms of the Amendment, each understands and agrees that the Bank has no duty to so notify it or any other guarantor/pledgor or to seek this or any future acknowledgment, consent or reaffirmation, and nothing contained herein shall create or imply any such duty as to any transactions, past or future.

        Dated as of October 2, 2020.

Credit Support Provider:

DocuSigned by:

*Kevin T. Haddad*

00D99D1E437472
_____
Kevin T. Haddad, Individually

DocuSign Envelope ID: 2c8f15bc3a7a3612-BFE8-963405091E24

Case 3:23-cv-00826-BN  Document 48-1    Filed 06/13/24    Page 38 of 100    PageID 524

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

**This Page Intentionally Left Blank**



BOA_001422

The authoritative document is owned by Bank of America, N.A. and this copy was created on 02/02/2022 12:23:10 PM EST. 1376200266. This document is a COPY.





### AMENDMENT NO. 3 TO LOAN AGREEMENT

This Amendment No. 3 (the "Amendment") dated as of January 31, 2022, is between Bank of America, N.A. (the "Bank") and ZTAR MOBILE, INC. (the "Borrower").

### RECITALS

A.  The Bank and the Borrower entered into a certain Loan Agreement dated as of March 29, 2019 (together with any previous amendments, the "Agreement").  The current commitment amount of Facility No. 1 is $6,000,000.00.

B.  The Bank and the Borrower desire to amend the Agreement.  This Amendment shall be effective on January 31, 2022, subject to any conditions stated in this Amendment.

### AGREEMENT

1.  Definitions.  Capitalized terms used but not defined in this Amendment shall have the meaning given to them in the Agreement.

2.  Amendments.  The Agreement is hereby amended as follows:

2.1    In Paragraph 2.2 the date "January 31, 2022" is changed to "March 31, 2022".

2.2    Paragraph 2.4 is hereby amended to read in its entirety as follows:

2.4    Interest Rate.

(a)    The interest rate is a rate per year equal to the sum of (i) the greater of the BSBY Daily Floating Rate or the Index Floor, plus (ii) 2.75 percentage point(s).  For the purposes of this paragraph, "Index Floor" means 0.5 percent.

(b)    The BSBY Daily Floating Rate is a fluctuating rate of interest which can change on each banking day.  The rate will be adjusted on each banking day to equal the BSBY Screen Rate for U.S. Dollar deposits two Business Days prior to the date of determination for a one month term beginning on that date; provided that if such rate is not published on such determination date then the rate will be the BSBY Screen Rate on the first Business Day immediately prior thereto.  "BSBY Screen Rate" means the Bloomberg Short-Term Bank Yield Index rate ("BSBY") administered by Bloomberg Index Services Limited and published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Bank from time to time). If such rate is not available at such time for any reason or the Bank makes the determination to incorporate or adopt a new interest rate to replace the BSBY Daily Floating Rate in credit agreements, then the Bank may replace the BSBY Daily Floating Rate with an alternate interest rate and adjustment, if applicable, as reasonably selected by the Bank, giving due consideration to any evolving or then existing conventions for such interest rate and adjustment (any such successor interest rate, as adjusted, the "Successor Rate").  In connection with the implementation of the Successor Rate, the Bank will have the right, from time to time, in good faith to make any conforming, technical, administrative or operational changes to this Agreement as may be appropriate to reflect the adoption and administration thereof and, notwithstanding anything to the contrary herein or in any other loan document, any amendments to this Agreement implementing such conforming changes will become effective upon notice to the Borrower without any further action or consent of the other parties hereto.  A "Business Day" is a day other than a Saturday or a Sunday on which banks are open for business in the State of New York.  If at any time the BSBY Daily Floating Rate

The authoritative document is owned by Bank of America, N.A. and this copy was created on 02/02/2022 12:23:10 PM EST. 1376200266. This document is a COPY.
DocuSign Envelope ID: 88CEEF84-E75E-4AAC-8F6A-750040364C79
Case 3:23-cv-00826-BN    Document 48-1    Filed 06/13/24    Page 40 of 100    PageID 526

or any Successor Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

3. <u>Representations and Warranties</u>. When the Borrower signs this Amendment, the Borrower represents and warrants to the Bank that: (a) there is no event which is, or with notice or lapse of time or both would be, a default under the Agreement except those events, if any, that have been disclosed in writing to the Bank or waived in writing by the Bank, (b) the representations and warranties in the Agreement are true as of the date of this Amendment as if made on the date of this Amendment, (c) this Amendment does not conflict with any law, agreement, or obligation by which the Borrower is bound, (d) if the Borrower is a business entity or a trust, this Amendment is within the Borrower's powers, has been duly authorized, and does not conflict with any of the Borrower's organizational papers, (e) the information included in the Beneficial Ownership Certification most recently provided to the Bank, if applicable, is true and correct in all respects, and (f) as of the date of this Amendment and throughout the term of the Agreement, no Borrower or Guarantor, if any, is (1) an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (2) a plan or account subject to Section 4975 of the Internal Revenue Code of 1986 (the "Code"); (3) an entity deemed to hold "plan assets" of any such plans or accounts for purposes of ERISA or the Code; or (4) a "governmental plan" within the meaning of ERISA.

4. <u>Conditions</u>. The effectiveness of this Amendment is conditioned upon the Bank's receipt of the following items, in form and content acceptable to the Bank:

4.1    A fully executed counterpart of this Amendment from the Borrower and each guarantor and/or collateral pledgor (collectively, a "Credit Support Provider") in form satisfactory to the Bank.

4.2    <u>KYC Information</u>.

(a)    Upon the request of the Bank, the Borrower shall have provided to the Bank, and the Bank shall be reasonably satisfied with, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act.

(b)    If the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, it shall have provided a Beneficial Ownership Certification to the Bank if so requested.

4.3    If the Borrower or any Credit Support Provider is anything other than a natural person, evidence that the execution, delivery and performance by the Borrower and/or such Credit Support Provider of this Amendment and any instrument or agreement required under this Amendment have been duly authorized.

5. <u>Effect of Amendment</u>. Except as provided in this Amendment, all of the terms and conditions of the Agreement, including but not limited to any Waiver of Jury Trial or Dispute Resolution Provision contained therein, shall remain in full force and effect.

6. <u>Electronic Records and Signatures</u>. This Amendment and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Amendment (each a "<u>Communication</u>"), including Communications required to be in writing, may, if agreed by the Bank, be in the form of an Electronic Record and may be executed using Electronic Signatures, including, without limitation, facsimile and/or .pdf. The Borrower agrees that any Electronic Signature (including, without limitation, facsimile or .pdf) on or associated with any Communication shall be valid and binding on the Borrower to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered to the Bank. Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Bank may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("<u>Electronic Copy</u>"), which shall be deemed created in the ordinary course of the Bank's

The authoritative document is owned by Bank of America, N.A. and this copy was created on 02/02/2022 12:23:10 PM EST. 1376200266. This document is a COPY.

business, and destroy the original paper document. All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, the Bank is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Bank pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Bank has agreed to accept such Electronic Signature, the Bank shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Obligor without further verification and (b) upon the request of the Bank any Electronic Signature shall be promptly followed by a manually executed, original counterpart. For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

**7. FINAL AGREEMENT. BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

**8. Notice of Final Agreement. THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

This Amendment is executed as of the date stated at the beginning of this Amendment.

Bank:

**Bank of America, N.A.**

By: _Andrew S. Walker_____
    Authorized Representative

Borrower:

ZTAR MOBILE, INC.

By: _kevin T Haddad_____
    Kevin T. Haddad, Chief Executive Officer

The authoritative document is owned by Bank of America, N.A. and this copy was created on 02/02/2022 12:23:10 PM EST. 1376200266. This document is a COPY.

## CONSENT AND REAFFIRMATION
## OF GUARANTORS AND PLEDGORS

Each of the undersigned (collectively referred to as the "Credit Support Providers") is a guarantor of, and/or is a pledgor of collateral for, the Borrower's obligations to the Bank under the Agreement.  Each Credit Support Provider hereby (i) acknowledges and consents to the foregoing Amendment, (ii) reaffirms its obligations under its respective guaranty in favor of the Bank and/or under any agreement under which it has granted to the Bank a lien or security interest in any of its real or personal property, and (iii) confirms that such guaranty and other agreements, including but not limited to any Waiver of Jury Trial or Dispute Resolution Provision contained therein, remain in full force and effect, without defense, offset, or counterclaim.  (Capitalized terms used herein shall have the meanings specified in the foregoing Amendment.)

Although each of the undersigned has been informed of the terms of the Amendment, each understands and agrees that the Bank has no duty to so notify it or any other guarantor/pledgor or to seek this or any future acknowledgment, consent or reaffirmation, and nothing contained herein shall create or imply any such duty as to any transactions, past or future.

Dated as of January 31, 2022

Credit Support Provider:

DocuSigned by:

*kevin T Haddad*

Kevin T. Haddad, Individually

Ref #: 1003574157 : - Ztar Mobile Inc
Amendment to Loan Agreement

- 4 -

BOA_001427

# Exhibit 3

Date: 8/14/2018 2:37:49 PM
**From: "Walker, Andrew - 3" andrew.s.walker@baml.com**
**To : "Kevin Haddad" khaddad@ztarmobile.com**
**Subject : RE: Bank of America**

Sure. Would be happy to discuss at 1. Look forward to talking.

Andrew S. Walker
Vice President, Relationship Manager
Bank of America Merrill Lynch
T 214.209.0244 M 254.931.0404
TX1-492-10-04, 901 Main Street, 10th Floor, Dallas, TX 75202-3714
Andrew.S.Walker@baml.com

The power of global connections™

-----Original Message-----
From: Kevin Haddad [mailto:khaddad@ztarmobile.com]
Sent: Tuesday, August 14, 2018 9:51 AM
To: Walker, Andrew - 3 <andrew.s.walker@baml.com>
Subject: Re: Bank of America

Hi Andrew,
I thought what we talked about first extend the current maturity another 3yrs and wait for the CAD improvement then pay off the $6M... then we talked about giving us additional $2M facility so we do not do the FX... where we would increase current CD an additional CAD 2M with interest rate to somehow offset certain amount from CD. I think we are currently at $5.4M guaranteed by the CAD$6.0M CD below target of 80% conversion rate we set originally when set this whole thing up. Otherwise, I would have converted at the 1.2 mark from CAD to USD and would have earned some interest on that cash long time ago.

Can we meet today at 1pm?

Regards,
Kevin

On 8/14/18, 9:04 AM, "Walker, Andrew - 3" <andrew.s.walker@baml.com> wrote:

    Kevin - Thanks for getting this back. Per the comments in the loan agreement:

    The first change made to the doc was increasing the loan amount from $6mm USD to $8mm USD. As we discussed previously, the $8mm CAD we be used to secure the $6mm USD line of credit so it should show that 2.1 reads  "the amount $4,100,000 is changed to $6,000,000"

    The second comment made by your attorney was adding a line about pricing. This amendment did not change the pricing at all and remains at Libor + 120 per the prior amendment. We would need to remove the language added stating that the rate is 2.75%.

    Per the personal guarantee language, we can remove it as when the original docs we done there was still a small amount remaining on the term loan that has since been paid off.

    Please give me a call if you would like to discuss further.

    Thanks,

    Andrew S. Walker
    Vice President, Relationship Manager
    Bank of America Merrill Lynch
    T 214.209.0244 M 254.931.0404
    TX1-492-10-04, 901 Main Street, 10th Floor, Dallas, TX 75202-3714
    Andrew.S.Walker@baml.com

    The power of global connections™

    -----Original Message-----
    From: Kevin Haddad [mailto:khaddad@ztarmobile.com]
    Sent: Thursday, August 09, 2018 6:10 PM
    To: Walker, Andrew - 3 <andrew.s.walker@baml.com>
    Subject: FW: Bank of America

    Hi Andrew,
    Hope you are having a nice trip...Please see attached...from our legal...let's talk on Monday.

ZTAR00482

Regards,
Kevin

On 8/9/18, 5:36 PM, "David Wilkie" <dwilkie@ztarmobile.com> wrote:

   Re-revised amendment draft attached.
   DTW

   ----------------------------------------------------------------
   This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to
important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer.   If you are not the intended recipient, please delete this message.

   ----------------------------------------------------------------
This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to
important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer.   If you are not the intended recipient, please delete this message.

ZTAR00483

# Exhibit 4

Message

| | |
|---|---|
| **From**: | Mayo, Michael [/O=BANK OF AMERICA/OU=NORTH AMERICAN ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MICHAEL.MAYO] |
| **Sent**: | 2/3/2022 12:15:28 PM |
| **To**: | Castillo, Jackie [/o=Bank of America/ou=North American Administrative Group/cn=Recipients/cn=jaqueline.castillo]; Walker, Andrew - 3 [/o=Bank of America/ou=North American Administrative Group/cn=Recipients/cn=andrew.s.walker] |
| **Subject**: | RE: Ztar |

Looking now

**From:** Castillo, Jackie
**Sent:** Thursday, February 3, 2022 12:14 PM
**To:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Cc:** Mayo, Michael <michael.mayo@bofa.com>
**Subject:** RE: Ztar

man oh man… this gets more and more messy…. any chance you have the old LOI you guys presented?

Thank you,
**Jackie Castillo**
Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com

**BANK OF AMERICA**

**From:** Walker, Andrew - 3
**Sent:** Thursday, February 3, 2022 12:12 PM
**To:** Castillo, Jackie <jaqueline.castillo@bofa.com>
**Cc:** Mayo, Michael <michael.mayo@bofa.com>
**Subject:** RE: Ztar

The intent was CAD. It was $6mm CAD, all asset lien and PG to get to $6mm USD revolver. Don't know how I missed that in the Loan agreement.

**From:** Castillo, Jackie
**Sent:** Thursday, February 3, 2022 12:09 PM
**To:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Cc:** Mayo, Michael <michael.mayo@bofa.com>
**Subject:** RE: Ztar

If statement are easier to pull then those, otherwise just screenshots that show every transaction will work…

I also want to confirm want our intent was in 2018/2019… I was reading through Alfred's CAM (shows up under my name but I was still in DFS lol) and he wrote that we would be securing the 6MM LOC with 6MM CAD which was

CONFIDENTIAL                                                                  BOA_002320

equivalent to 4.46MM USD at the time… but the loan agreement says 6MM USD… when I did the renewal last year the balance was over 6MM CAD but under 6MM USD. So sounds like they have been under the requirement since day 1 if the intent was USD

Thank you,
**Jackie Castillo**
Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com

**BANK OF AMERICA** 🏦

**From:** Walker, Andrew - 3
**Sent:** Thursday, February 3, 2022 12:02 PM
**To:** Castillo, Jackie <jaqueline.castillo@bofa.com>
**Cc:** Mayo, Michael <michael.mayo@bofa.com>
**Subject:** RE: Ztar

Already had '21 requested. Will get '20. Do you want something that shows the trends or will the statements work?

It started at $7mm in January and worked its way down to where we are currently.

**From:** Castillo, Jackie
**Sent:** Thursday, February 3, 2022 11:57 AM
**To:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Cc:** Mayo, Michael <michael.mayo@bofa.com>
**Subject:** Ztar

Can you get us the historical balance breakout for all of 2020 and 2021 from the Canadian team? I still don't know who the contact is otherwise I would ask them directly for screenshots.

Thank you,
**Jackie Castillo**
Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com



CONFIDENTIAL                                                                BOA_002321

# Exhibit 5

Message

**From**:     Barksdale, Lisa B [/OU=VIRTUAL/CN=SMTP/CN=LISA.BARKSDALE@BOFA.COM]
**Sent**:     5/12/2022 4:54:28 PM
**To**:     Castillo, Jackie [/OU=VIRTUAL/CN=SMTP/CN=JAQUELINE.CASTILLO@BOFA.COM]
**Subject**:     RE: Ztar Mobile
**Attachments**:     image001.png; image003.png

Thanks.  could you provide some more specifics around the credit facility structure, maturities, covenants, etc.  Build it like a timeline so someone who isn't familiar could pick it up and understand the facility, requirements, and what happened.  It is hard to say the collateral was released two years ago and we didn't find out until when?  Make sense?

**Lisa Barksdale**
SVP / Commercial Credit Executive
O:  713.247.6046
M: 713.817.0523
lisa.barksdale@bofa.com

---

**From:** Castillo, Jackie <jaqueline.castillo@bofa.com>
**Sent:** Thursday, May 12, 2022 4:48 PM
**To:** Barksdale, Lisa B <lisa.barksdale@bofa.com>
**Subject:** RE: Ztar Mobile

Hey Lisa,
I was hoping we would eventually be able to work something out with them.. here is a summary, let me know if you need me to clear anything up or need more info:

The collateral was accidently released back in March of 2020 and the funds were deposited into the Ztar Mobiles Canada Inc business account. I spoke to the Treasurer in Canada (no longer with bofa) and asked him to help me better understand their process, how the collateral was released, if the client requested the release or if this was completed by a BofA employee back when we discovered the error. He informed me that they do not have auto renewal but the hold is typically extended each time we complete an extension or a renewal on our end. He did confirm that it was set up as hold but that the deposit system doesn't highlight the hold. He also stated that it occurred during the beginning stages of COVID where they started working from home. He stated Treasury missed it and Ops didn't catch it. To his knowledge he is not aware that the release was ever requested directly by the client but he could not 100% confirm. I do not know the name of the role that released the funds but I am attaching the full email chain for context maybe reaching out to someone in the same role could help find out the exact role? He did say they could correct the error for us but we did not go through with the process since the client did not have the funds needed to complete this. We also did not want to leave the client without any cash to run the business. FYI- The UCC filing was (is) still in place when it was released.

As for the financial issues. We should have caught this early 2021 but had past due reporting we were unaware existed. I think between all of the CCS transitions (them being trained and trying to catch up and learn their portfolio at the same time) we had not been alerted of past due items and didn't know we were 2 FYE's behind. The FYE20 FS was received on 1/27/2022 and FYE21 was received on 2/1/2022. Upon receipt it was discovered that leverage FYE20 was 13.09X and FYE21 leverage was 7.42x. FCC remained acceptable but dropped from being near 12x in 2019 to under 4x in 2020 and 2021. We looked to do a potential term out but most options lead to PF FCC being below 1x and leverage above 4x (unless we received an immediate day down). The client confirmed they would be unable to make any type of paydown so that was out of the question. Primary contributing factors were an increase to COGS due to marketing (cost of

CONFIDENTIAL                                                                                          BOA_002876

acquiring new customers) and a slight decline in sales when compared to 2019. NI went from being close to $2mm to being $266K in 2019 and $543K in 2021.

Thank you,
**Jackie Castillo**
VP, Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com

**BANK OF AMERICA**

**From:** Barksdale, Lisa B <lisa.barksdale@bofa.com>
**Sent:** Thursday, May 12, 2022 2:30 PM
**To:** Castillo, Jackie <jaqueline.castillo@bofa.com>
**Subject:** Ztar Mobile

We are going to charge off the $5.4MM this month, which is now generating a request for more information on what went wrong with the cash collateral.

I know it was in a CD in CAD that was released upon maturity and put into a DDA.  I'm being asked for more detail to see if we need to open an SIAI.

Can you give me a summary of what happened with the collateral and where within the org it sat and if we know what "role" released it that would be helpful. Also need a brief summary of the financial issues that have led to the weak performance so can give Katie a heads up.

Thanks, need as soon as you can.

**Lisa Barksdale**
Senior Vice President / Commercial Credit Executive
Global Banking and Markets – Wholesale Credit
Bank of America

Bank of America Tower
800 Capitol St
TX5-800-14-00
Houston, TX 77002
O:  713.247.6046
M: 713.817.0523
lisa.barksdale@bofa.com

**BANK OF AMERICA**

CONFIDENTIAL

# Exhibit 6

Message

| | |
|---|---|
| **From**: | Castillo, Jackie [/OU=VIRTUAL/CN=SMTP/CN=JAQUELINE.CASTILLO@BOFA.COM] |
| **Sent**: | 2/7/2022 8:14:14 AM |
| **To**: | Shields, Brent [/OU=VIRTUAL/CN=SMTP/CN=BRENT.SHIELDS@BOFA.COM] |
| **Subject**: | RE: Canada Collateral Account Help |
| **Attachments**: | image003.png; image005.png; image006.png |

Thanks Brent, do you have the mailbox or contact I can reach out to?


Thank you,
**Jackie Castillo**
Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com

**BANK OF AMERICA**

**From:** Shields, Brent
**Sent:** Friday, February 4, 2022 4:13 PM
**To:** Castillo, Jackie <jaqueline.castillo@bofa.com>
**Subject:** RE: Canada Collateral Account Help

Treasury Ops or Loans Ops?

**From:** Castillo, Jackie
**Sent:** Friday, February 04, 2022 5:07 PM
**To:** Shields, Brent <brent.shields@bofa.com>
**Subject:** RE: Canada Collateral Account Help

Is there someone in a back office who could potentially review the transaction to see how it was requested?


Thank you,
**Jackie Castillo**
Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com

**BANK OF AMERICA**

**From:** Shields, Brent
**Sent:** Friday, February 4, 2022 3:35 PM
**To:** Castillo, Jackie <jaqueline.castillo@bofa.com>
**Subject:** RE: Canada Collateral Account Help

CONFIDENTIAL                                                                                           BOA_002905

To my knowledge, we have never talked to the customer. I think we didn't roll the deposit.

**From:** Castillo, Jackie
**Sent:** Friday, February 04, 2022 4:32 PM
**To:** Shields, Brent <brent.shields@bofa.com>
**Subject:** RE: Canada Collateral Account Help

I this the bigger issue is that the client dipped into the account and now he doesn't have enough funds to get the CD back to over CAD$6mm.

COVID makes total sense how we could have missed something like this. To clarify, did the client request the release or did the Bank release the funds on our own? The only reason we need to clarify is that there is a small possibility that this could end up in court as a worst case scenario so we are trying to get as much information as possible. we would like to avoid that scenario if possible so we want to understand what happened.

Thank you,
**Jackie Castillo**
Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com

**BANK OF AMERICA**

**From:** Shields, Brent
**Sent:** Friday, February 4, 2022 3:24 PM
**To:** Castillo, Jackie <jaqueline.castillo@bofa.com>
**Subject:** RE: Canada Collateral Account Help

We don't have auto renewal but the trade should have been rolled. It was set up as hold but the deposit system doesn't highlight the hold. It was as we all began working from home in COVID.
Treasury missed it and Ops didn't catch it. We could back-value a deposit if that helps.
Sorry for the stress.
Let me know how I can fix.

**From:** Castillo, Jackie
**Sent:** Friday, February 04, 2022 4:18 PM
**To:** Shields, Brent <brent.shields@bofa.com>
**Subject:** RE: Canada Collateral Account Help

Hi Brent,
I am not sure if everyone else needs to be included so I am only going to respond to you. Feel free to add anyone else who needs to be included.

Our issue is that the client signed a pledge agreement on our line of credit and agreed to maintain those funds in the CD account. The original loan agreement matured 03/31/2020, but we have been renewing this loan and it is still active. The

CONFIDENTIAL

pledged collateral should have continued to roll over each time we extended the maturity date on the loan. The removal of those funds has now caused a default on our loan agreement and we are trying to see how to proceed.

Do you know if the client request that the funds be released in 03/2020? Do you know who authorized the CD closure? Was there a notification sent out to our team to inform us that the CD was going to be released? In Michael's email below, he states it should have been set up as auto renewal, can you confirm how this account was set up?

Thank you,
**Jackie Castillo**
Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com

**BANK OF AMERICA**

**From:** Shields, Brent
**Sent:** Friday, February 4, 2022 3:04 PM
**To:** Monette, Karen <karen.monette@bofa.com>; Castillo, Jackie <jaqueline.castillo@bofa.com>; Butters, Doug <doug.butters@bofa.com>; Marcoccia, Sergio G <sergio.marcoccia@bofa.com>; Ksenych, Andrew <andrew.ksenych@bofa.com>
**Cc:** Burek, Lori <lori.burek@bofa.com>; Maron, Michael <michael.maron@bofa.com>
**Subject:** RE: Canada Collateral Account Help

Hi Jackie,
I am the Treasurer in Canada. I see there was a hold on the deposit but it matured on March 26,2020 and was not rolled. How can I help fix ?
Kind regards,
Brent

**From:** Monette, Karen
**Sent:** Friday, February 04, 2022 3:50 PM
**To:** Castillo, Jackie <jaqueline.castillo@bofa.com>; Shields, Brent <brent.shields@bofa.com>; Butters, Doug <doug.butters@bofa.com>; Marcoccia, Sergio G <sergio.marcoccia@bofa.com>; Ksenych, Andrew <andrew.ksenych@bofa.com>
**Cc:** Burek, Lori <lori.burek@bofa.com>; Maron, Michael <michael.maron@bofa.com>
**Subject:** RE: Canada Collateral Account Help

Brent, Doug: Can you help with this appears related to a CD. Can you respond to Jackie as this is going all over the bank and operations is not able to shed any light on this.

Kind Regards,

CONFIDENTIAL                                                                                                          BOA_002907

Karen Monette
SVP, Group Operations Manager
Canada Treasury Operations
Bank of America, National Association, Canada Branch
Tel: 647-790-5169

---

**From:** Maron, Michael
**Sent:** Friday, February 4, 2022 3:48 PM
**To:** Monette, Karen <karen.monette@bofa.com>
**Cc:** Castillo, Jackie <jaqueline.castillo@bofa.com>; Burek, Lori <lori.burek@bofa.com>
**Subject:** RE: Canada Collateral Account Help

Treasury and Treasury Ops might know. You may need to review what instructions they were provided with upon placing the funds in the Term Deposit.
If instructed correctly, they should have held the term deposit and it should have automatically renewed upon each maturity with only perhaps the interest being placed in their DAS account.
Seems on one of the Term Deposit maturity dates, the maturing principal may have been placed in their DAS account rather than renewed for another period.

```
 NBKZRM3              C U S T O M E R   P R O F I L E         04/02/22 12:40:49
                               DEPOSITS HELD
  OPTION:     TRX:  6D8  KEY:  48734
          CUSTOMER HAS NO DEPOSITS
 CUSTOMER:  48734   ZTAR MOBILE CANADA, INC        AO 5860 THAI TRAN
                                                   AA 2834 CANADA CLIENT SVCS
```

## Michael Maron

Canada Credit Services | Bank of America Merrill Lynch
181 Bay Street, 4th Floor | Toronto, ON | M5J 2V8
☎: 416-369-2769 | Fax: 312-453-4041

---

**From:** Monette, Karen
**Sent:** Friday, February 4, 2022 3:33 PM
**To:** Vleuten, Earl <earl.vleuten@bofa.com>; Castillo, Jackie <jaqueline.castillo@bofa.com>; Burek, Lori <lori.burek@bofa.com>; Maron, Michael <michael.maron@bofa.com>
**Cc:** Canada Helpdesk <canada.helpdesk@bofa.com>
**Subject:** RE: Canada Collateral Account Help

Adding in Lori Burek and Mike Maron from our loan servicing department if they can assist. Lori, Mike are you able to help Jackie?

Kind Regards,

Karen Monette
SVP, Group Operations Manager
Canada Treasury Operations
Bank of America, National Association, Canada Branch
Tel: 647-790-5169

CONFIDENTIAL

BOA_002908

**From:** Vleuten, Earl
**Sent:** Friday, February 4, 2022 3:31 PM
**To:** Castillo, Jackie <jaqueline.castillo@bofa.com>; Monette, Karen <karen.monette@bofa.com>
**Cc:** Canada Helpdesk <canada.helpdesk@bofa.com>
**Subject:** RE: Canada Collateral Account Help

Hi Karen,

Can you help direct Jackie to the right team to assist with her account issue?

Thanks,

**Earl Vleuten**
Office : (416) 369-8490
Canada.Helpdesk@baml.com
Employee Technology Support (ETS) | LATAM/Canada

**Help is just a few clicks away at TechConnect** (  on the taskbar)

Click here to try:



---

**From:** Castillo, Jackie <jaqueline.castillo@bofa.com>
**Sent:** Friday, February 4, 2022 2:58 PM
**To:** Canada Helpdesk <canada.helpdesk@bofa.com>
**Subject:** FW: Canada Collateral Account Help
**Importance:** High

Canada Help Desk,
I have reached out to 2 other departments who have not been able to assist. Would you be able to assist me with the following:

Thank you,
**Jackie Castillo**
Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com

**BANK OF AMERICA** 〜

**From:** Castillo, Jackie
**Sent:** Friday, February 4, 2022 12:57 PM
**To:** dedicatedcanada <dedicatedcanada@bankofamerica.com>
**Subject:** FW: Canada Collateral Account Help
**Importance:** High

CONFIDENTIAL                                                                                    BOA_002909

Dedicated Canada Team,

We need help ASAP on an internal issue that has caused a default on a loan agreement. We have line of credit that is primarily cash secured by a CD account in Canada. In our 2020 renewal we show the UCC filing for this account (which might be tied to an old loan agreement based on the date the filing was placed). Somehow after our 2019 renewal, this account was converted from a CD account over to what seems to be a regular DDA account (based on the type of statements the client it receiving). The client signed a security agreement agreeing to maintaining the funds in the account and dipped into the account last year. This is of course an event of default and we are working through the process internally to determine next steps.

We would like to find out how our hold was removed from this account and how it was converted to a DDA account without the team's knowledge. Per the pledge agreement, the Canadian CD account was #666056. Per the most recent statements received, the new DDA account is #48734206. As noted above, the removing the hold and convering this over to a DDA account allowed the client access to the funds, once he removed funds this causes an event of default on our loan agreement.

Thank you,
**Jackie Castillo**
Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com

**BANK OF AMERICA**

**From:** Castillo, Jackie
**Sent:** Thursday, February 3, 2022 2:18 PM
**To:** Canada Commitments_global business services <gbs_canada_commitments@bofa.com>
**Subject:** Canada Collateral Account Help
**Importance:** High

Canada Team,

We have a line of credit with a pledged collateral Canadian CD account #666056 (see pledge agreement). Somehow this account was converted to a DDA account #48734206 and our pledge was released. Would it be possible to find out when this account was converted to a regular DDA account and why our pledge was released? Could we also find out if we ever placed a hold on this account back in 2019 when it was pledged?

Please let me know if I need to reach out to a different Canadian group for help.

Thank you,
**Jackie Castillo**
Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com

CONFIDENTIAL                                                                                                    BOA_002910

# Exhibit 7

Message

| | |
|---|---|
| **From**: | Kevin Haddad [khaddad@ztarmobile.com] |
| **Sent**: | 3/8/2022 10:51:59 AM |
| **To**: | Walker, Andrew - 3 [/o=Bank of America/ou=North American Administrative Group/cn=Recipients/cn=andrew.s.walker] |
| **Subject**: | Loan Commitie |

Hi Andrew,
We have been a minority own customer of the bank for over 10yrs. all of this causing us to scramble to find another bank to provide for the facility in very short time, which mean time away to educate new bank on our business. Please let me know who or an introduction to the loan committee or person in charge of the loan approval process to discuss.

Regards,
Kevin

BOA_002655

# Exhibit 8

**FULL NARRATIVE**

| EXECUTIVE SUMMARY | 2 page limit |
|---|---|

**CLIENT / PROSPECT OVERVIEW**

- **ZTAR Mobile, Inc.** ("BORROWER" or the "COMPANY") provides hosted wireless solutions that enable retailers, affinity groups, and brand name labels to deliver private brand wireless services to their subscribers.  It offers private-brand prepaid wireless services, such as airtime, service creation, billing, and customer care.  The Company also provides Web portal access for customers to manage their accounts and monitor usage.  In addition, it offers voice mail, caller ID, call waiting, three-way calling, and text messaging services.
- The client sells prepaid cards and wireless private label programs.  They generate revenue off of the prepaid SIMS as well as creating the programs for various entities (corporate, not-for-profits, etc.).  The Borrower buys minutes from Rogers Wireless and resells them as prepaid minutes to individuals at convenient stores (7/11, etc.) and online.
- The Company has established an exclusive distribution with 7-11 US, 7-11 Canada, Petro Canada, Circle K, Avondale, Shell, Dairy Farm, and others where the retailers provide shelf space for Ztar to display and sell its products.  However, these stores take the products and services provided by Ztar and present them to customers as their own brand (i.e. Circle-K Talk & Go, 7 Eleven Speak Out).  The retailers get a cut of the initial sale and remits the remainder back to Ztar.  On the carrier side, Ztar has wholesale agreements in place with AT&T and Spring in the US, Rogers Wireless in Canada, M1 in Singapore.  Contracts go through 2025.
- Currently, the Company operates in Canada, the United States, and Singapore.
- The 100.0% owner is Kevin Haddad who founded the Company in 2006.  He, along with his wife, run the day-to-day operations.  Kevin started the business and has grown it to what it is.  The Borrower is very capable and very intelligent in the communications and wireless space.
- Borrower is an ORR 6-
- Higher Risk client due to Media-Telecom industry.

**FINANCIAL HIGHLIGHTS**

- Revenue growth of 5.5% for FYE17.
- Consistent NPM of 10.0% 9% for FYE16 and FYE17, respectively.
- FD/EBITDA of 2.99x at FYE17.
- Strong FCCR of 7.9x at FYE17.

**TRANSACTION OPPORTUNITY / REQUEST SUMMARY**

- FAS for FYE 12/31/17 and covenant test – In Compliance.
- Close/payoff the $2MM RLOC that was governed by a borrowing base.
  - This separate LOC was secured by an ABA lien and is being consolidated into the one large CD secured LOC below.
  - LOC balance to be transferred to the other LOC – see below.
  - Borrowing base and related reporting will no longer be required given payoff.
- Increase the existing LOC from $4MM to $6MM.
  - A portion will be CD Secured via Canadian CD in the amount of $6MM CAD ($4.46MM USD).  Gap covered by ABA lien and personal guarantee.
  - New maturity dated of 5/31/2020 (17 months).
  - Personal Guarantee (Kevin Haddad).
  - Annual FCCR financial covenant.
  - Annual reporting (PFS, Company financial Statements)
- Waiver of the following reporting requirements:
  - A/R Aging, A/P Agings, and Borrowing Base Certificates for April –November, given the Bank now has 10/31/18 information on file.

**CHALLENGES / KEY CREDIT RISKS**

- Refer to next page.

**RATIONALE / MITIGANTS / RECOMMENDATIONS**

- Established company and management team since 2006.
- Satisfactory financial performance up to and including FYE 12/31/17 and interim 09/30/18.
- Cash collateral with appropriate cushion to account for currency risk (CAD).  The non-cash secured exposure is covered by the personal guarantee and ABA lien on business assets (See SSOR).

[ PAGE  \* MERGEFORMAT ]

CONFIDENTIAL

BOA_003044

| REPAYMENT SOURCE(S) & COLLATERAL ANALYSIS (IF APPLICABLE) | *3 page limit* |
|---|---|

PSOR:  Cash flow from operations – Strong.
Comments:  Strong FCCR of 7.9x at FYE17 and 4.89X at 3Q18.  MCAPEX assumed at $20M annually, given the service nature of the Company with minimal fixed assets.  Given the cash collateral as a SSOR, a stress test was not performed.

| CGI Simplified Model - Version 2.1 | Generated: | 12/20/18 | | |
|---|---|---|---|---|
| **Ztar Mobile Inc** | | **Fiscal Year End** | | **YTD** |
| *$(000)s* | **12/31/2015** | **12/31/2016** | **12/31/2017** | **9/30/2018** |
| **Cash Flow:** | | | | |
| Op. Co. Recurring EBITDA | $1,316 | $1,676 | $1,640 | $727 |
| + Rel. Co. Recurring EBITDA | $0 | $0 | $0 | $0 |
| **Consolidated EBITDA** | **$1,316** | **$1,676** | **$1,640** | **$727** |
| **Annualized EBITDA** | | | | **$969** |
| + Rent Expense | $59 | $79 | $42 | $17 |
| **Consolidated EBITDAR** | **$1,375** | **$1,755** | **$1,682** | **$744** |
| | | | | |
| - Maintenance CapEx | ($20) | ($20) | ($20) | ($15) |
| **Cash Flow** | **$1,355** | **$1,735** | **$1,662** | **$729** |
| | | | | |
| | | | | |
| **Debt Service/Fixed Charges:** | | | | |
| Op Co. Actual Interest | $63 | $82 | $27 | $125 |
| + Rel Co. Actual Interest | $0 | $0 | $0 | $0 |
| + Principal Payments | $234 | $234 | $109 | |
| + Distributions/Dividends/Tax | $24 | $26 | $30 | $7 |
| - Discretionary Distributions | | | | |
| + Rent Expense | $59 | $79 | $42 | $17 |
| +/- Other DS/FC Adjustments | | | | |
| **Debt Service/Fixed Charges** | **$380** | **$421** | **$208** | **$149** |
| | | | | |
| | | | | |
| Actual/Total CapEx | | | | |
| | | | | |
| | | | | |
| **Consolidated Statistics** | | | | |
| *CF Coverage "Fully Loaded":* | *3.62* | *4.17* | *8.09* | *4.99* |
| *Actual CapEx, Total Distr.* | | | | |
| ***PUV Cash Flow Coverage*** | ***3.57*** | ***4.12*** | ***7.99*** | ***4.89*** |
| *Maintenance CapEx,* | | | | |
| *Non-Discretionary Distr.* | | | | |
| | | | | |
| **PUV Threshhold** | **1.15** | **1.15** | **1.15** | **1.15** |
| | | | | |
| Above PUV Threshold? | Yes | Yes | Yes | Yes |

SSOR:             Cash deposit @ BAC – Strong.

Comments:         A portion of the $6MM revolver is cash secured.  Borrower will pledge $6MM cash denominated in CAD (equivalent to $4.46MM USD) held via
                  Canadian account.  Refer to Security Agreement and collateral hold.  Remaining non-cash secured portion is covered via ABA lien as well as
                  personal guarantee.

Non-Cash Secured Portion:

| (000's) | Source | Date | Margined Asset Coverage | | |
|---|---|---|---|---|---|
| | | | Eligible Value | Advance Rate | Margined Value |
| Accounts Receivable - 0-30 days  old | Fin Stmts | 9/30/2018 | $1,142,041 | 80% | $913,633 |
| Accounts Receivable - 31-60 days old | | | | | $0 |
| Accounts Receivable - 61-90 days old | | | | | $0 |
| Accounts Receivable - 91+ | | | | | $0 |
| Total A/R per aging | | | $1,142,041 | | $913,633 |
| Other Ineligibles | | | | | $0 |
| Eligible A/R | | | $1,142,041 | | $913,633 |
| | | | | | |
| Raw Materials | | | | | $0 |
| WIP | | | | | $0 |
| Finished Goods | | | $426,470 | 50% | $213,235 |
| Total Inventory | | | $426,470 | | $213,235 |
| Ineligible Inventory | | | | | $0 |
| Eligible Inventory | | | $426,470 | | $213,235 |
| | | | | | |
| Equipment/Fixed Assets | | | $80,135 | 50% | $40,068 |
| | | | | | |
| LOC/BBLOC - full commitment | | | | | $1,540,000 |
| LOC/BBLOC - outstanding balance | | 12/18/2018 | | | $1,540,000 |
| | | | | | |
| **Excess/(Overadvance) - commitment** | | | | | **-$373,065** |
| **Revolver Asset Coverage -commitment** | | | | | **0.76** |
| | | | | | |
| **Excess/(Overadvance) - outstanding** | | | | | **-$373,065** |
| **Revolver Asset Coverage - outstanding** | | | | | **0.76** |

- Remaining uncovered exposure is covered by Kevin Haddad, personally who reports liquid assets of $1.5MM per a PFS dated 12/31/17.

**SUMMARY FINANCIAL ANALYSIS**                                                                                                          *3 page limit*

| Ztar Mobile Inc | Fiscal Year End | | | YTD |
|---|---|---|---|---|
| $(000)s | 12/31/2015 | 12/31/2016 | 12/31/2017 | 9/30/2018 |
| **Operating Performance:** | | | | |
| Revenues | $18,265 | $16,806 | $17,733 | $12,131 |
| *% Growth* | | *-8.0%* | *5.5%* | |
| Cost of Sales | $14,510 | $12,870 | $13,447 | $9,305 |
| Gross Profit | $3,755 | $3,936 | $4,286 | $2,826 |
| *% Margin* | *20.6%* | *23.4%* | *24.2%* | *23.3%* |
| Operating Expenses | $2,641 | $2,327 | $2,533 | $2,011 |
| *% of Revenue* | *14.5%* | *13.8%* | *14.3%* | *16.6%* |
| Operating Profit | $1,114 | $1,609 | $1,753 | $815 |
| *% Margin* | *6.1%* | *9.6%* | *9.9%* | *6.7%* |
| **Pre-Tax Net Income** | **$1,249** | **$1,592** | **$1,613** | **$595** |
| + Interest | $63 | $82 | $27 | $125 |
| + Depr./Amort. | $4 | $2 | $0 | $7 |
| + Extr. Loss/(Income) | $0 | $0 | $0 | $0 |
| **Bottom-Up EBITDA** | **$1,316** | **$1,676** | **$1,640** | **$727** |
| *% Margin* | *7.2%* | *10.0%* | *9.2%* | *6.0%* |
| Adjustments | | | | |
| Adjustments | | | | |
| Adjustments | | | | |
| **Op. Co. Recurring EBITDA** | **$1,316** | **$1,676** | **$1,640** | **$727** |
| **Annualized EBITDA** | | | | **$969** |

- ZTAR Mobile's primary source of revenue is through the sale of prepaid phone cards in the U.S. and Canada. To fund the minutes sold, they purchase minutes from Rogers Canada.
- All revenue flows through the US entity so it is recognized as "domestic". However in reality, 70% is from the Canadian operations.
- Revenue concentrations include 7-11 (50%), Petro Canada (30%) and all others make up 20%.
- Through the interim period ended 09/30/18, the Borrower reports $12.1MM in Revenue. On a simple annualized basis, Revenues are anticipated to be $16.2MM, which are slightly behind FY17 while EBITDA is projected to be $969M. The Borrower's GM% has remained relatively stable.
- From an EBITDA perspective, the Borrower generated EBITDA of $727M through 3Q18, which (on an annualized basis) is slightly behind the trailing fiscal year. Despite some EBITDA compression, the Borrower still reports a PUV Cash Flow Coverage ratio of 4.89X.

| CGI Simplified Model - Version 2.1 | Generated: | 12/20/18 | | |
|---|---|---|---|---|
| **Ztar Mobile Inc** | Fiscal Year End | | | YTD |
| $(000)s | 12/31/2015 | 12/31/2016 | 12/31/2017 | 9/30/2018 |
| **Balance Sheet:** | | | Interim Months: | 9 |
| Cash & Cash Equivalents | $6,905 | $8,875 | $10,795 | $9,557 |
| Accounts Receivable | $1,027 | $1,284 | $1,318 | $1,142 |
| Inventory | $424 | $397 | $171 | $427 |
| Total Current Assets | $9,649 | $11,869 | $15,768 | $12,524 |
| PP&E (net) | $7 | $26 | $26 | $80 |
| Total Long Term Assets | $1,604 | $2,042 | $2,313 | $3,531 |
| **Total Assets** | **$11,253** | **$13,911** | **$18,081** | **$16,055** |
| Accounts Payable | $3,125 | $2,129 | $3,163 | $2,110 |
| ST Loans Payable | $0 | $0 | $0 | $0 |
| CPLTD | $234 | $234 | $109 | $0 |
| Total Current Liabilities | $10,256 | $9,584 | $10,522 | $10,161 |
| LT Debt | $2,746 | $4,506 | $4,795 | $5,434 |
| Total Long Term Liabilities | $2,746 | $4,506 | $4,795 | $5,434 |
| **Total Liabilities** | **$13,002** | **$14,090** | **$15,317** | **$15,595** |
| **Net Worth** | **($1,749)** | **($179)** | **$2,764** | **$460** |

CONFIDENTIAL                                                                                                                                    BOA_003047

**FULL NARRATIVE**

| | | | | |
|---|---|---|---|---|
| Tangible NW + Sub Debt | ($3,289) | ($2,139) | $559 | ($2,954) |
| **Related Co. Assets** | | | | |
| **Related Co. Senior Debt** | | | | |
| **Related Co. Total Liabilities** | | | | |
| **Related Co. TNW + Sub Debt** | | | | |
| **Proforma/OBS Debt** | | | | |

**Operating Co. Statistics**

| | | | | |
|---|---|---|---|---|
| A/R DSO | 21 days | 28 days | 27 days | 26 days |
| Inventory DSO | 11 days | 11 days | 5 days | 13 days |
| A/P DSO | 79 days | 60 days | 86 days | 62 days |
| Current Ratio | 0.94 | 1.24 | 1.50 | 1.23 |
| Quick Ratio | 0.77 | 1.06 | 1.15 | 1.05 |
| Net Working Capital | ($607) | $2,285 | $5,246 | $2,363 |

**Consolidated Statistics**

| | | | | |
|---|---|---|---|---|
| Total Liabilities-SD/TNW+SD | -3.95 | -6.59 | 27.40 | -5.28 |
| Funded Sr. Debt/TNW+Sub Debt | -0.91 | -2.22 | 8.77 | -1.84 |
| Total Funded Debt/EBITDA | 2.26 | 2.83 | 2.99 | 5.61 |
| Funded Senior Debt/EBITDA | 2.26 | 2.83 | 2.99 | 5.61 |
| Total FD / Annualized EBITDA | | | | 5.57 |

- Total Annualized EBITDA was $969M while Total Funded Debt at 3Q18 was $5.4MM for resulting Leverage of 5.57X. Annualized EBITDA is calculated based on a simple, annualized basis. No LTM figures are presented as 09/30/17 financial information was not available at the time of analysis.
- Due from related entities of $2.2MM for FYE17 is money left in Malaysia that they are having trouble getting out. Since they sold their Malaysian business, they have been fighting with the authorities to be able to move it back out. So, while not completely written off, the outcome is not entirely certain.
- The interim period 09/30/18 reports a significant Due From / Due to Common Owned Company. The spreading analyst spread the Due From Common Owned Company as a Long Term Asset while the Due to Common Owned Company as a short term Liability. The Working Capital position of the company Appears to be significantly negative, but this is largely a result of the way the financials are spread. For analysis purposes, the Due To and Due From have been netted against one another.
- YTD EBITDA of $727M and total funded debt of $5.4MM result in an elevated leverage profile through the interim period. The balance is from the Revolver and is partially cash secured.
- The majority of cash they report on the balance sheet is held outside the US (Canada).
- Note: the LOC is reported/spread as long-term, since it has historically been a 2 year commitment.

### KEY CREDIT RISKS & MITIGANTS                                           *2 page limit*

- Currency risk – low risk. Collateral for the subject LOC includes a CAD CD. MITIGANT: The amount of the CD is $6MM CAD vs $6MM USD committed exposure, which leaves a small amount of non-cash secured risk. The ABA lien and personal guarantee help mitigate the shortfall.

- Competition – moderate risk. Ztar has very little competition in the prepaid and private label programs in Canada where they do the majority of their business (70%). They are tied in closely with Rogers Wireless who also dominates the Canadian market (have had a long-term relationship with Rogers Wireless as a supplier/vendor since 2006). Other competitors include Plinton (Singapore), Teleena (Netherlands) and Effortel (Belgium). These are all larger, foreign companies that also operate as MVNE's.

### RISK RATING                                                             *½ page limit*

Mid-size commercial RRSC was used due to TRE > $3MM and revenues >$10MM. ORR6- is deemed appropriate using the financial statements for FYE 12/31/17 and 09/30/18.

### EXPOSURE MANAGEMENT STRATEGY                                           *5 page limit*

Exposure Management Strategy: Maintain

### PROFITABILITY / RETURNS                                                *1 page limit*

- B3A Return of 13.461%, which includes R12M revenue from non-credit products of $182.9M (TM & FX).

## ztar mobile LOC

| | |
|---|---|
| Relationship: | Ztar Mobile Inc |
| Relationship Manager: | Andrew S Walker |
| Pricing Region: | BB North Texas |
| Pricing Date: | 12/19/2018 |
| Projected Close: | 3/19/2019 |
| Risk Rating: | Mid-Size Commercial - 6- |

**Annual Lifetime Average Projected Returns & Non-Credit Revenue**

| Projected Relationship B3A | Guidance Relationship B3A | Projected Relationship B3S | Guidance Relationship B3S | Historical R12 Non-Credit Revenue | Projected Non-Credit Revenue |
|---|---|---|---|---|---|
| 13.461% | 12.0% | 13.025% | 11.611% | $183,541 | $182,964 |

**New Credit Opportunities**

| Loan Type | Status | Maturity | Commitment | Initial Balance | Spread | Spread Guidance | Fees | LGD Collateral |
|---|---|---|---|---|---|---|---|---|
| Line of Credit | Renewal | 17 months | $6,000,000 | $5,450,000 | +120 bps | N/A | None | All Asset Lien |

Opportunity Link: https://ent01.precisionlender.com/price/opportunity/#/33c6d414-9f6d-41e8-9ea1-e6dd3b86b847

| REGULATORY, COMPLIANCE & POLICY | *2 page limit* |
|---|---|

- Flood Due Diligence:  Completed, collateral is non-RE so no additional due diligence is necessary.  See attached SFHA Form.
- DDI:  No new DDI was initiated as there was no material change in key risks or no new management.
- PA – FS Quality:  TRE > $5MM requires Audited Financial Statements.  Our Borrower provides company prepared financial statements, however, as a mitigant we maintain a portion of the exposure to be cash-secured.

| ADDENDA | *4 page limit* |
|---|---|

[●]

# Exhibit 9

**Date : 5/28/2019 9:05:21 PM**
**From : "Walker, Andrew - 3" andrew.s.walker@baml.com**
**To : "Kevin Haddad" khaddad@ztarmobile.com**
**Subject : Conference room**

Hey Kevin - I snuck into your conference room. Come join whenever you have a chance!

Andrew Walker
Andrew.S.Walker@baml.com
214-209-0244

---

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer. If you are not the intended recipient, please delete this message.

ZTAR00064

# Exhibit 10

O: 713.247.6046
M: 713.817.0523
lisa.barksdale@bofa.com

---

**From:** Castillo, Jackie <jaqueline.castillo@bofa.com>
**Sent:** Thursday, May 12, 2022 6:02 PM
**To:** Barksdale, Lisa B <lisa.barksdale@bofa.com>
**Subject:** RE: Ztar Mobile

Let me know if you need more detail. Here were the latest terms we had. The CAD was left in red because this was the one issue that I had brought up where the loan agreement states USD when it should have read CAD$.

| Summary of Terms | Latest Terms |
|---|---|
| Borrower | Ztar Mobile Inc |
| Facility | $6MM Line of Credit |
| Maturity | 3/31/2022 |
| Purpose | General Working Capital |
| Collateral | Time Deposit with BofA no less than $6mm CAD + All Asset Lien (excluding Real Estate) |
| Guarantors | Personal Guaranty of Kevin T Haddad |
| Repayment Terms | Monthly interest only, principal due at maturity |
| Pricing/ Fees | Pricing: BSBY+ 2.75%, <br> Floor: 50bps <br> Unused fee: None <br> Upfront Fee: None |
| Financial Covenants | Basic Fixed Charge Coverage Ratio ≥ 1.25x |
| Financial Reporting | Annual FYE company prepared financial statements <br> Annual personal financial statements for Kevin Haddad |
| Other | N/A |

Timeline:

**March 29, 2019 Loan Agreement:** The loan was restructured December 2018 paying off 1 existing $2mm LOC, consolidating it with a second existing $4mm LOC. The loan docs were not signed until March of 2019. **Maturity date of 05/31/2020**, L+1.20, no floor. All other terms above remained the same aside from the need for a compliance certificate.

**March 22, 2020 Short Term Extension:** Maturity date pushed out from 05/31/2020 to **07/30/2020.**

**October 02, 2020 Amendment No.1:** Maturity pushed out from 07/30/2020 to **01/31/2021.** L+3.10% rate, floor of 1.00%.

Appendix Page 70

CONFIDENTIAL

**January 28, 2021 Amendment No.2:** Maturity pushed out from 01/31/2021 to **01/31/2022.** L+2.55% rate, floor of .75%. Compliance Certificate requirement removed. Client had began to discuss releasing the collateral in Canada a little at a time. We let him know we could as long as he was reducing the LOC the same amount. The intent was to reduce the LOC availability to $5mm or under throughout the years. This would have qualified him for the no compliance certificate requirement the Centers. Steve, Tom, Rick, Andrew and myself discussed proactively providing this for him since he was near the TRE threshold and we expected him to begin the payment/collateral release process soon. LTM performance showed no signed of weakness with LTM EBITDA 09/30/202 of 2.5MM, FCC 18.47x and leverage 2.19x. We reached out to the Canadian TSA to confirm the balance on the CD and received the following screen print. We did not question it in any way since we ask for the balance of the CD. It wasn't until 2022 and the balance matched our historical average balance. It wasn't until we were looking into all of this that we zoomed into the print screen and realized what we actually sent was a screen print of the DDA account and not the CD (see screenshot below).

**January 31, 2022 Amendment No.3:** Maturity pushed out from 01/31/2022 to **03/31/2022.** L+2.75% rate, changed to BSBY. We had just received 2021 FS (waiting on spreads) and were still waiting on 2021 FS. We noticed the dip but per the conversation with the RM 2022 was going to look much better so 2021 wasn't going to be an issue. Also to clarify, each time we talked to him on his 2021 performance he claimed COVID had a great impact on his business. He claimed he was performing better than ever since people were switching to prepaid services to help cut down on costs.

**End of January – February 03, 2022:** Sometime around the end of January while we were getting the extension prepared Andrew found out there was an issue with the Canadian account. He was under the impression that it was somehow converted to a DDA account but that the funds were all still there. We didn't have a clear understanding of what was going on so we moved forward with the ST extension. I started reaching out to every Canadian mailbox I could think of to get me answers on 02/03/2022. Most of them were dead-ends. One of those emails eventually got me in contact who eventually got me in contact with Brent. Brent was the one who actually clarified that it was never converted to a DDA but deposited into the existing DDA and that the funds essentially been used throughout the year. I ended up requesting all of the monthly statements from 12/2019 until 12/2021 plus the current balance at the time and created a timeline for our SAG call to show when it hit the account and how essentially when they went "below the LA requirement".

Jul-09

|  | CAD | USD Estimate |  | Conversion Rate: |  |
|---|---|---|---|---|---|
|  |  |  |  | 2/7/2022 | 0.79 |
| 12/31/2019 | 2,209,453.76 | 1,745,468.47 |  |  |  |
| 1/31/2020 | 2,001,830.67 | 1,581,446.23 |  |  |  |
| 2/29/2020 | 2,063,553.63 | 1,630,207.37 |  |  |  |
| **3/31/2020** | **8,360,169.78** | **6,604,534.13** |  |  |  |
| 4/30/2020 | 8,357,403.93 | 6,602,349.10 |  |  |  |
| 5/31/2020 | 8,042,259.46 | 6,353,384.97 |  |  |  |
| 6/30/2020 | 7,393,810.91 | 5,841,110.62 |  |  |  |
| 7/31/2020 | 6,691,884.46 | 5,286,588.72 |  |  |  |
| 8/31/2020 | 6,565,042.41 | 5,186,383.50 |  |  |  |
| 9/30/2020 | 6,207,353.75 | 4,903,809.46 |  |  |  |
| 10/31/2020 | 6,147,863.53 | 4,856,812.19 |  |  |  |
| 11/30/2020 | 6,301,543.83 | 4,978,219.63 |  |  |  |
| 12/31/2020 | 6,138,300.83 | 4,849,257.66 |  |  |  |
| 1/31/2021 | 6,024,782.94 | 4,759,578.52 |  |  |  |
| 2/28/2021 | 6,004,219.83 | 4,743,333.67 |  |  |  |
| **3/31/2021** | **5,365,457.62** | **4,238,711.52** |  |  |  |
| 4/30/2021 | 5,249,302.43 | 4,146,948.92 |  |  |  |
| 5/31/2021 | 4,833,894.26 | 3,818,776.47 |  |  |  |
| 6/30/2021 | 4,700,596.37 | 3,713,471.13 |  |  |  |
| 7/31/2021 | 4,092,668.74 | 3,233,208.30 |  |  |  |
| 8/31/2021 | 4,600,125.00 | 3,634,098.75 |  |  |  |

Appendix Page 71

CONFIDENTIAL

BOA_001314

| | | |
|---|---|---|
| 9/30/2021 | 4,085,811.09 | 3,227,790.76 |
| 10/31/2021 | 3,683,864.40 | 2,910,252.88 |
| 11/30/2021 | 4,255,722.29 | 3,362,020.61 |
| 12/31/2021 | 3,648,188.68 | 2,882,069.06 |
| **Current** | **2/9/2022** | **3,808,958.30** | **3,009,077.06** |



Thank you,
**Jackie Castillo**
VP, Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com



CONFIDENTIAL

# Exhibit 11

561 of 100

Message

**Sent**:          4/8/2022 3:22:55 PM
**To**:            khaddad@ztarmobile.com; dwilkie@ztarmobile.com
**Subject**:       RE: secmail: Questions

Kevin,

Please see the attached forbearance which reflects the revised address.  Please sign all four documents that have been provided to you, email copies to me, then send the originals to me at the following address:

John Clarke, SVP
Bank of America
MO8-060-12-02
1200 Main Street
Kansas City, MO 64116

Finally, we need to complete the paydown today if possible.

Thanks - John

**From:** khaddad@ztarmobile.com <khaddad@ztarmobile.com>
**Sent:** Friday, April 8, 2022 12:44 PM
**To:** Clarke, John M <john.m.clarke@bofa.com>; dwilkie@ztarmobile.com
**Subject:** RE: secmail: Questions

Hi John,

I understand your position. If you would please correct the address of the company in the documents to 211 E. 7th Street, Suite 620, Austin, TX 787801, I will go ahead and sign.

I will maintain, however, that I was not told I needed to find another bank until our March 3 meeting. In fact, Andrew was asking for my personal financial statement for Bank of America on February 16, 2022. He wasn't telling me to find another bank prior to that (or after). email bellow;

----

**From:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Date:** Thursday, February 17, 2022 at 11:42 AM
**To:** Kevin Haddad <khaddad@ztarmobile.com>
**Subject:** RE: 2021 Fin

Great. Thanks Kevin. Also want to let you know I received the PFS.

Thanks,


**Andrew S. Walker**
Vice President, Sr. Relationship Manager
Bank of America Merrill Lynch
T 214.209.0244 M 254.931.0404
TX1-492-10-04, 901 Main Street, 10th Floor, Dallas, TX 75202-3714
Andrew.S.Walker@bofa.com

The power of global connections™





**From:** Kevin Haddad [mailto:khaddad@ztarmobile.com]
**Sent:** Thursday, February 17, 2022 11:41 AM
**To:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Subject:** 2021 Fin


Hi Andrew,

We will send you the updated 2021 fin to replace the interim fin later today as breakage was not calculated. Just the ppp number in the other income was reported.


Regards,

Kevin


Ztar Mobile, Empowering People

---

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at

BOA_001367

http://www.bankofamerica.com/emaildisclaimer. If you are not the intended recipient, please delete this message.

---

**From:** Clarke, John M
**Sent:** Fri, 8 Apr 2022 16:27:31 +0000
**To:** Kevin Haddad, David Wilkie
**Cc:**
**Subject:** RE: Questions

Kevin,

Unfortunately, I am not able to agree to the changes you propose based upon the following:

Number 1, Recital Paragraph D

From the Bank's perspective, the Borrower is in default under the Loan Documents as paragraph 5 of the Security Agreement, dated March 29, 2019, which states "Pledgors shall not withdraw funds from the Deposit Accounts without <u>Bank's prior written consent</u>. Pledgors agree that, upon maturity of any Deposit Account with a maturity date, such Deposit Account shall be renewed at Bank's then prevailing rate of interest for successive ninety (90) day periods (or such other time period as agreed upon by Bank and Pledgors)."

To the best of my knowledge, the Bank never provided "prior written consent"; however, the funds have been withdrawn from the Deposit Account referenced in the Security Agreement. If you have any written communication from the Bank stating that the collateral was officially being released and no longer needed to be renewed under a secured Deposit Account, as required in the Security Agreement, then please share a copy with me at this time.

Number 2. Loan commitment Condition date

On my intro call to you on March 3rd, 2022, I informed you that you needed to find another lender. That was 36 days ago already, and I understand, based upon subsequent phone calls with you, that you are making progress

BOA_001368

and getting positive feedback from 4 or more Banks that you have been working with at least since March 21st, 2022.  According to your prior Relationship Manager, Andrew Walker, he reportedly informed you that you needed to refinanced the debt prior to our March 3rd, 2022 intro call.

May 31st, 2022 will be the 89th day since I personally informed you to seek another lender.  Under the approved forbearance terms, you are only required to 1) provide a written commitment letter from a financial lending institution in an amount sufficient to satisfy the outstanding balance, or 2) provide a pledge of cash collateral sufficient to secure the outstanding balance, and will be given another 30 days to close with the new lender (i.e. until June 30th, 2022) for a total of 119 days.

The terms reflected in the forbearance were the best terms I was able to get approved, and the Bank is not in a position to alter them at this time.  If at the end of the approved forbearance period you are close to securing another lender or pledging sufficient cash collateral to secure the remaining balance, then I will do my best to obtain approval for another short term extension; however, please do not take this as a commitment as it would require formal Bank approval.

Please let me know if you have any questions, or would like to discuss.

Thanks - John

**From:** Kevin Haddad <khaddad@ztarmobile.com>
**Sent:** Thursday, April 7, 2022 4:10 PM
**To:** Clarke, John M <john.m.clarke@bofa.com>; David Wilkie <dwilkie@ztarmobile.com>
**Subject:** Questions

Hi John,

I have two items I want the Bank to change in the Forbearance Agreement for your consideration:

Number 1.  Recital Paragraph D

BOA_001369

Ztar Mobile take issue with paragraph D in the recitals to the Forbearance Agreement.  The recital states that Ztar is in default under the Loan Documents because it violated Section 5 of the Security Agreement by not renewing the certificate of deposit that matured March 26, 2020. However, the Security Agreement states that the CD renewal periods can be altered by the parties, which is what happened. After the CD matured in March 2020, the funds were put in Ztar Mobile Canada's operating account, and Bank of America sent us a report telling us that this had been done. Nothing was ever said about renewing or purchasing another CD. In fact, I remember a conversation with Andrew in which he told me I could use the CD proceeds in the operating account.

 I don't know why Bank of America did not ask to have the collateral CD renewed (I wish it had), but that's how it happened. I just don't want to sign a document that misrepresents the facts.

My solution would be to simply delete that paragraph. It changes nothing about anybody's legal rights. But Ztar Mobile is not in default for this reason.

I also want you to understand that Ztar Mobile would have gotten on the task of finding a replacement loan much sooner if Andrew had not led me to believe that Bank of America was going to extend the line of credit. I believed that it was absolutely going to be done all the way until mid-March. It would have been nice to have a little more warning.

Number 2.  Loan commitment Condition date

Ztar is asking for a change in the deadline for obtaining a commitment letter from May 31 to June 30. As section 4.2 is written, if we do not produce a loan commitment within 54 days, the bank can require us to put up 100% of the loan obligation in cash or withdraw the forbearance. The banks I have been working with all have different requests for due diligence information and different schedules for meeting with their committees and making decisions.

Ztar is also requesting the full 90 days of forbearance to generate funds internally.  We are cutting costs and may have other levers to pull, but these will take a little time. If we come to the end of the 90-day forbearance period and don't have a new loan, I want to be able to pay down further on the loan and still have working capital.  We absolutely can and will pay this loan, whether or not we can get a new loan, but it won't make it easier if we have to deal with collateral calls or legal action on May 31.

 I also feel Ztar Mobile need to disclose to each potential new bank the position the company is in with Bank of America.  So, if we lose forbearance due to not having a commitment letter by May 31, it might make it harder to get a commitment or a loan after that. This is not in your interest or ours.

BOA_001370

I also really don't see how the 30-day reduction gives the bank much practical benefit. We will repay in full by June 30 or have to make a satisfactory additional principal paydown or face enforcement, pretty much either way.  But after 18 years as a customer, I don't see why 30 days makes that much difference. We at Ztar Mobile are working hard so we can to get this done as fast as possible and will do what is necessary. I just don't want the rug pulled out from under the company in 55 days. I hope you can make this change or give some other assurance that won't happen.

I think things are basically going well with the banks. Several have indicated interest. If you have any suggestions on getting them to move quicker, I'd like to hear them. But I think we should know more in a month and hopefully this date issue won't matter.

At any rate, please let me know if you are able to adjust the loan commitment letter date and/or take out the recital D.

Thanks for your work on this. I have enjoyed working with Bank of America over 16 years and appreciate the assistance you have provided to Ztar.

Regards,

Kevin

---

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer. If you are not the intended recipient, please delete this message.

BOA_001371

# Exhibit 12

Message

| | |
|---|---|
| **From**: | Kevin Haddad [khaddad@ztarmobile.com] |
| **Sent**: | 10/20/2021 9:43:16 AM |
| **To**: | Walker, Andrew - 3 [/o=Bank of America/ou=North American Administrative Group/cn=Recipients/cn=andrew.s.walker] |
| **Subject**: | Re: Account |

Ok

Ztar Mobile, Empowering People

---

**From:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Sent: Wednesday, October 20, 2021 9:41:29 AM**
**To:** Kevin Haddad <khaddad@ztarmobile.com>
**Subject:** RE: Account

I am going to head there a little early (have another meeting nearby) and try and grab a spot. I made a back-up reservation at Hudson house on lovers if we can't get in. I'll text you and let you know.

**Andrew S. Walker**
Vice President, Sr. Relationship Manager
Bank of America Merrill Lynch
T 214.209.0244 M 254.931.0404
TX1-492-10-04, 901 Main Street, 10th Floor, Dallas, TX 75202-3714
Andrew.S.Walker@bofa.com

The power of global connections™

**BANK OF AMERICA**

Andrew

**From:** Kevin Haddad [mailto:khaddad@ztarmobile.com]
**Sent:** Wednesday, October 20, 2021 9:34 AM
**To:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Subject:** Re: Account

They only have 1:30 reservations unless you did one for 12v

Ztar Mobile, Empowering People

---

**From:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Sent:** Wednesday, October 20, 2021 9:26:40 AM
**To:** Kevin Haddad <khaddad@ztarmobile.com>
**Subject:** RE: Account

See you there!

BOA_001713

**From:** Kevin Haddad [mailto:khaddad@ztarmobile.com]
**Sent:** Wednesday, October 20, 2021 9:16 AM
**To:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Subject:** Re: Account

Do you want to try R&D

Ztar Mobile, Empowering People

---

**From:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Sent:** Wednesday, October 20, 2021 9:12:35 AM
**To:** Kevin Haddad <khaddad@ztarmobile.com>
**Subject:** RE: Account

Hey Kevin – you guys still working from home? Anywhere for lunch sound good? I'm flexible to be wherever.

Andrew

---

**From:** Kevin Haddad [mailto:khaddad@ztarmobile.com]
**Sent:** Thursday, October 14, 2021 4:36 PM
**To:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Subject:** Re: Account

Wed at 12 would be great.

---

**From:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Date:** Thursday, October 14, 2021 at 10:07 AM
**To:** Kevin Haddad <khaddad@ztarmobile.com>
**Subject:** RE: Account

Hey Kevin – let's do Wednesday. Just let me know what time works and I will get a meeting planner out.

Looking forward to it!

**Andrew S. Walker**
Vice President, Sr. Relationship Manager
Bank of America Merrill Lynch
T 214.209.0244 M 254.931.0404
TX1-492-10-04, 901 Main Street, 10th Floor, Dallas, TX 75202-3714
Andrew.S.Walker@bofa.com

The power of global connections™

**BANK OF AMERICA** ≫

---

**From:** Kevin Haddad [mailto:khaddad@ztarmobile.com]
**Sent:** Wednesday, October 13, 2021 6:27 PM

BOA_001714

**To:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Subject:** Re: Account

Hi Andrew,
So sorry missed replying to this email. Had setting in the draft box.

How are you. Next week would be great for Tuesday or Wed early lunch.

Regards,
Kevin

Ztar Mobile, Empowering People

---

**From:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Sent:** Friday, October 1, 2021 8:21:22 AM
**To:** Kevin Haddad <khaddad@ztarmobile.com>
**Subject:** Account

Hey Kevin – hope all is well! Let me know if you are up for grabbing lunch sometime next week. Its been too long!!

Just wanted to give you a heads up the loan payment hit and the account has over drafted. Let me know if I can do anything to help out.  Also, if you can provide the FYE statements I will look at decreasing the rate on the loan as things continue to change over the past 18 months.

Thanks,

**Andrew S. Walker**
Vice President, Sr. Relationship Manager
Bank of America Merrill Lynch
T 214.209.0244 M 254.931.0404
TX1-492-10-04, 901 Main Street, 10th Floor, Dallas, TX 75202-3714
Andrew.S.Walker@bofa.com

The power of global connections™

**BANK OF AMERICA**

---

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer. If you are not the intended recipient, please delete this message.

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer. If you are not the intended recipient, please delete this message.

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer. If you are not the intended recipient, please delete this message.

BOA_001715

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer. If you are not the intended recipient, please delete this message.

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer. If you are not the intended recipient, please delete this message.

BOA_001716

# Exhibit 13

**BANK OF AMERICA**  **To:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Subject:** RE: 1-41443080765 Ztar Mobile Deposits

Hi Andrew,

I hope you're doing well. Would the most recent statements be sufficient? Or would you need certain dates worth of deposits?

Thank you,

**Crystal Meraz**
Officer, Treasury F&S Advisor
Treasury Fulfillment, Service & Operations
Bank of America Merrill Lynch
IL4-540-20-34, 540 W Madison ST Chicago IL 60661
888.221.8488 Ext. 432
**dedicatedcanada@bankofamerica.com**

**From:** Tsui, Teresa <teresa.tsui@bofa.com>
**Sent:** Wednesday, January 19, 2022 11:03 AM
**To:** dedicatedcanada <dedicatedcanada@bankofamerica.com>; Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Subject:** 1-41443080765 Ztar Mobile Deposits

You  forward the message to wrong person.  We don't handle this client.

**Teresa Tsui**
Canada Credit Services | Global Credit Operations
Bank of America Merrill Lynch
181 Bay St. Suite 400 Toronto, ON M5J 2V8 | Tel. (416) 369-2788 | Fax: (312) 453-4041 | Email: teresa.tsui@bofa.com
Department Email: CanadaCreditServices@bankofamerica.com

**From:** dedicatedcanada
**Sent:** Wednesday, January 19, 2022 11:57 AM
**To:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>; Tsui, Teresa <teresa.tsui@bofa.com>
**Subject:** RE: Ztar Mobile Deposits

Hi Teresa,

Would you be able to assist with the below request.

Regards,

**Roshni Patel**
VP, Treasury F&S Sr. Specialist - Integrated
Treasury Fulfillment, Service & Operations
Bank of America
IL4-540-20-34, 540 West Madison St. Chicago, Illinois 606601
Email: **dedicatedcanada@bankofamerica.com**
Fax: 312.453.2300

CONFIDENTIAL                                                                                        BOA_002053

**From:** Walker, Andrew - 3
**Sent:** Wednesday, January 19, 2022 10:34 AM
**To:** dedicatedcanada <dedicatedcanada@bankofamerica.com>
**Subject:** RE: Ztar Mobile Deposits

Sorry, the deposits that are held in Ztar's Canadian account are part of the security on a loan agreement. We need to verify the amount of the deposits in the account.

Thanks,

**Andrew S. Walker**
Vice President, Sr. Relationship Manager
Bank of America Merrill Lynch
T 214.209.0244 M 254.931.0404
TX1-492-10-04, 901 Main Street, 10th Floor, Dallas, TX 75202-3714
Andrew.S.Walker@bofa.com

The power of global connections™

**BANK OF AMERICA**

---

**From:** dedicatedcanada
**Sent:** Wednesday, January 19, 2022 10:31 AM
**To:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Subject:** RE: Ztar Mobile Deposits

Good morning,

Can you please clarify your request?

**Regards,**

**Dana Bauer**
Treasury F&S Advisor – Integrated
Treasury Fulfillment, Service & Operations
Bank of America Merrill Lynch
IL4-540-20-34, 540 W Madison St., Chicago, IL 60661
dedicatedcanada@bankofamerica.com
Business Hours: M-F 7:30am-4:30pm CT

---

**From:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Sent:** Wednesday, January 19, 2022 10:21 AM
**To:** dedicatedcanada <dedicatedcanada@bankofamerica.com>
**Subject:** Ztar Mobile Deposits

CONFIDENTIAL

BOA_002054

Team – can you please provide a screen shot of the Canadian account for Ztar Mobile?

Thanks and let me know if I can provide anything else.

Thanks,

**Andrew S. Walker**
Vice President, Sr. Relationship Manager
Bank of America Merrill Lynch
T 214.209.0244 M 254.931.0404
TX1-492-10-04, 901 Main Street, 10th Floor, Dallas, TX 75202-3714
<u>Andrew.S.Walker@bofa.com</u>

The power of global connections™



CONFIDENTIAL                                                                                     BOA_002055

# Exhibit 14

**From:** Mayo, Michael
**Sent:** Thursday, December 16, 2021 11:21 AM
**To:** Reeves, Nikki <nikki.reeves@bofa.com>
**Subject:** FW: ZTAR

I am going to go ahead and start to face this up.

**BANK OF AMERICA** **From:** Castillo, Jackie
**Sent:** Thursday, December 16, 2021 10:51 AM
**To:** Mayo, Michael <michael.mayo@bofa.com>
**Cc:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Subject:** RE: ZTAR

This one is usually a straight renewal it is on the SF CAM so I would copy most of the information I did last year and tweak the comments to fit this year.

| Exposure Summary: Ztar Mobile Inc | | RR: | 7+ | | |
| --- | --- | --- | --- | --- | --- |
| *$ in MM's* | | **TRE** | | | **TRE** |
| Revolver 1Y | | 6.0 | Daylight Overdraft Limit | | 0.1 |
| **TOTAL TRE** | | **$6.00** | Total Intraday | | **$0.1** |

Last year we did a 1Y deal. We will need to change pricing to BSBY. We reduced pricing to L+2.55% and added a 75bps floor last year. No Upfront and no unused (we will need to get Will's approval again to not have an upfront fee). Depending on the new RRSC, we may need to revisit pricing. We had to get an exception last year… That is also assuming they come out a 7, If they come out a 6 then we are good. Their performance improved during COVID so hopefully we can get the better RR. The FRR will receive a lift since it is partially cash secured.

Last year we discussed the possibility of releasing some collateral (they are partial cash secured by a Canadian account with us, Andrew can reach out to provide the balance verification) and reducing the line. Once we get the repayment model and RRSC we can talk to Tom about the renewal.

Andrew- Do we need to make any changes to the RLOC? Have they asked us to release part of the collateral yet? They are not maxed out but they are not revolving the line and have not made a payment since before 2019. Is there anything else we should include in our renewal?

| | | Facility Global Commitment: | 8,000,000.00 | USD | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Drill down for details | | | | | | | |
| Effective | Transaction | Pricing | Amount in USD | Base Rate | RAC Rate | All-In-Rate | Repricing Date | Total Outstandings | Currency | LIBFL | Transaction description |
| 29-Mar-2019 | Increase | LIBFL | 1,550,000.00 | 2.49963 | | 3.69963 | | 5,450,000.00 | USD | 5,450,000.00 | |
| 29-Mar-2019 | Increase | LIBFL | 7.88 | 2.49963 | | 3.69963 | | 5,450,007.88 | USD | 5,450,007.88 | GFS 3247675 Payoff |

Thank you,
**Jackie Castillo**
Credit Officer
Global Commercial Banking
Bank of America
Office 214.209.8843, Cell 972.209.7834
TX1-492-10-05, 901 Main Street 10th Floor, Dallas TX 75202
jaqueline.castillo@bofa.com

CONFIDENTIAL                                                                                          BOA_002617

**BANK OF AMERICA**

**From:** Mayo, Michael
**Sent:** Thursday, December 16, 2021 10:14 AM
**To:** Castillo, Jackie <jaqueline.castillo@bofa.com>
**Subject:** ZTAR

Getting ready to start facing up the CAM.   Any words of wisdom?   One year or two?  Any changes?

Michael A. Mayo
Senior Vice President
Bank of America, N.A.
Mail Code: TX2-574-05-02
One Cowboys Way, Suite 500
Frisco, Texas 75034
Tel: 469-294-7153
E-mail: michael.mayo@bofa.com
-
*This communication from Bank of America - may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information.  If you receive this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy. This communication may contain nonpublic personal information about consumers subject to the restrictions of the Gramm-Leach-Bliley Act. You may not directly or indirectly reuse or re-disclose such information for any purpose other than to provide the services for which you are receiving the information.*

CONFIDENTIAL

# Exhibit 15

Message

| From: | Gatchalian, Everdale M [/O=BANK OF AMERICA/OU=NORTH AMERICAN ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=EVERDALE.M.GATCHALIAN] |
| Sent: | 5/28/2021 4:29:28 PM |
| To: | Walker, Andrew - 3 [/o=Bank of America/ou=North American Administrative Group/cn=Recipients/cn=andrew.s.walker]; Herrick, Chelsea M [/o=Bank of America/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=DELAY, CHELSEA M. ZKMMQ2M742] |
| Subject: | RE: 2021 Pricing Event |
| Flag: | Flag for follow up |

Thanks for your time today. Here are my recommendations:

Red – Insulate (Highgate)
Yellow – Targeted Services to Standard (mostly controllable with paper statements and banking center deposits)
Green – All to standard (Bedrock – nonrelationship)
Orange – discuss, there is opportunity to increase somewhere between target services and all services to standard (in detailed table at bottom)

| Family GCI Name | 2.5% Client Impact | 5% Client Impact | 7.5% Client Impact | 10% Client Impact | Target Svcs to Std Client Impact | All Svcs to Std Client Impact | WCM to $100 Impact | Rationale for Product Recommendation | Product Recommended Decision |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

**REDACTED: Personal Information**

CONFIDENTIAL

BOA_002646

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ZTAR MOBILE INC | $ 639 | $ 875 | $ 875 | $ 875 | $ 875 | $ 6,549 | $ - | Med to high margin, in-scope services, not in prior event | Accept 5% Increase |

REDACTED: Personal Information

Green – recommend to standard

Yellow – all part of legacy CashPro Express (either insulate or incremental increase)

| Detail Service Code Name | R12 Volume | Current Price | Standard Price | R12 PxV | R12 Discount $ | Targeted Service? |
|---|---|---|---|---|---|---|
| GENERAL DISB CKS PAID-IMAGE | 11 | $ 0.17 | $ 0.20 | $ 22 | $ 4 | YES |
| ACCOUNT MAINTENANCE | 1 | $ 27.00 | $ 35.00 | $ 324 | $ 96 | NO |
| ACCOUNT MAINTENANCE | 2 | $ 28.00 | $ 35.00 | $ 672 | $ 168 | NO |
| ATM DEPOSITS | 1 | $ 2.00 | $ 2.50 | $ 24 | $ 6 | NO |
| ATM DEPOSITS | 1 | $ 2.00 | $ 2.50 | $ 24 | $ 6 | NO |
| CASHPRO ONLINE CDR ACCOUNT | 2 | $ - | $ 30.00 | $ - | $ 720 | NO |
| CASHPRO ONLINE CDR ITEM | 739 | $ - | $ 0.16 | $ - | $ 1,419 | NO |
| CASHPRO ONLINE PDR ACCOUNT | 2 | $ - | $ 30.00 | $ - | $ 720 | NO |
| CASHPRO ONLINE PDR ITEM | 633 | $ - | $ 0.13 | $ - | $ 987 | NO |
| CASHPRO ONLINE SUBSCRP BUS BNK | 1 | $ 49.95 | $ 85.00 | $ 599 | $ 421 | NO |
| CASHPRO REPORTING SUBSCRIPTION | 1 | $ - | $ 150.00 | $ - | $ 1,800 | NO |
| CURR COIN DEP $100-ATM | 1 | $ 0.12 | $ 0.25 | $ 1 | $ 2 | NO |
| REMOTE DEPOSIT ACCOUNT MAINT | 2 | $ 38.00 | $ 50.00 | $ 912 | $ 288 | NO |
| WIRE MONTHLY SUBSCRIPTION | 1 | $ - | $ 75.00 | $ - | $ 900 | NO |

T 214.209.0244 M 254.931.0404
TX1-492-10-04, 901 Main Street, 10th Floor, Dallas, TX 75202-3714
Andrew.S.Walker@bofa.com

The power of global connections™

**BANK OF AMERICA**

---

**From:** Walker, Andrew - 3
**Sent:** Wednesday, October 27, 2021 9:42 AM
**To:** 'Kevin Haddad' <khaddad@ztarmobile.com>
**Subject:** Financials

Hey Kevin – Dale should be sending you an email shortly about scheduling something with Lori to continue the merchant conversation.

In the meantime, do you have the year-end financials you can share?

Thanks,

**Andrew S. Walker**
Vice President, Sr. Relationship Manager
Bank of America Merrill Lynch
T 214.209.0244 M 254.931.0404
TX1-492-10-04, 901 Main Street, 10th Floor, Dallas, TX 75202-3714
Andrew.S.Walker@bofa.com

The power of global connections™

**BANK OF AMERICA**

---

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer. If you are not the intended recipient, please delete this message.

BOA_002185

Message

| | |
|---|---|
| **From**: | Walker, Andrew - 3 [/O=BANK OF AMERICA/OU=NORTH AMERICAN ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=ANDREW.S.WALKER] |
| **Sent**: | 7/7/2021 11:08:31 AM |
| **To**: | Gatchalian, Everdale M [/o=Bank of America/ou=North American Administrative Group/cn=Recipients/cn=everdale.m.gatchalian] |
| **Subject**: | RE: AT 24MM |

Yeah I think that is plenty incentive to make a change. I think if we were just cheaper at all we could have won it.

Andrew Walker
214-209-0244

**From:** Gatchalian, Everdale M <everdale.m.gatchalian@bofa.com>
**Date:** Wednesday, Jul 07, 2021, 11:07 AM
**To:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Subject:** RE: AT 24MM

Yeah – Lori asked if it was good enough. I said I would take 65 M annually in a heartbeat lol.

## Dale Gatchalian, CTP

Director, Senior Treasury Sales Officer
Global Transaction Services
Bank of America
TX2-574-05-02, 1 Cowboys Way, Suite 500, Frisco, TX 75034
T 469 294 7139
everdale.m.gatchalian@bofa.com

**BANK OF AMERICA**

Managing Through COVID-19 Impact

Customer Service: 888-400-9009
Card Digital Services: 800-822-5985
Digital Services: (CashPro Applications & Card Management Portals): 888-589-3473

Subscribe to *SmartBrief for Treasurers* for a complimentary digest of relevant news and information for treasury professionals.

**From:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>
**Sent:** Wednesday, July 7, 2021 11:07 AM
**To:** Gatchalian, Everdale M <everdale.m.gatchalian@bofa.com>
**Subject:** RE: AT 24MM

Boom. Sounds like a winner

CONFIDENTIAL                                                                 BOA_002200

Andrew Walker
214-209-0244

---

**From:** Gatchalian, Everdale M <everdale.m.gatchalian@bofa.com>
**Date:** Wednesday, Jul 07, 2021, 11:05 AM
**To:** Jones, Kanton <kanton.jones@bofa.com>
**Cc:** Walker, Andrew - 3 <andrew.s.walker@bofa.com>, Herrick, Chelsea M <chelsea.m.herrick@bofa.com>, Buchanan, Lori <lori.buchanan@bofa.com>
**Subject:** FW: AT 24MM

Kanton – It looks like Lori is going to save Ztar almost 65 M annually on merchant processing through us. We need to provide a pricing proposal for CPP to see what the net savings would be. Could you help Chelsea model that out? Do you think that the CPP pricing alone is cheaper than the third party they use today?

## Dale Gatchalian, CTP

Director, Senior Treasury Sales Officer
Global Transaction Services
Bank of America
TX2-574-05-02, 1 Cowboys Way, Suite 500, Frisco, TX 75034
T 469 294 7139
everdale.m.gatchalian@bofa.com

**BANK OF AMERICA**

Managing Through COVID-19 Impact

Customer Service: 888-400-9009
Card Digital Services: 800-822-5985
Digital Services: (CashPro Applications & Card Management Portals): 888-589-3473

Subscribe to *SmartBrief for Treasurers* for a complimentary digest of relevant news and information for treasury professionals.

---

**From:** Buchanan, Lori <lori.buchanan@bofa.com>
**Sent:** Wednesday, July 7, 2021 10:55 AM
**To:** Gatchalian, Everdale M <everdale.m.gatchalian@bofa.com>
**Subject:** AT 24MM


Kind Regards,

Lori Buchanan
Vice President, Senior Merchant Sales Officer
Global Banking & Markets- Merchant Services

Cell: 702.808.0953
Lori.buchanan@bofa.com

For immediate support, please call our dedicated help line at 800.430.7161. They will take great care of you!

CONFIDENTIAL

Business Track/Clientline Support: 800.285.3978
Payeezy Help Desk: 855.448.3493
PCI Help desk: 855.395.0976



CONFIDENTIAL                                                                                BOA_002202

## <u>CERTIFICATE OF SERVICE</u>

       The undersigned Counsel hereby certifies that the foregoing has been served via ECF and as indicated below on June 13, 2024.


Kyle S. Hirsch                                   Via ECF: kyle.hirsch@bclplaw.com
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004
(602) 364-7000 (Telephone)
(602) 364-7070 (Facsimile)

ATTORNEYS FOR PLAINTIFF BANK OF
AMERICA, N.A.




                                         */s/ Jose M. Portela*
                                         Jose Portela